ESTATE OF ETHLYN DAVIS, DECEASED, DON M. DAVIS, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Davis v. Commissioner
Docket No. 28647-90
United States Tax Court
T.C. Memo 1993-155; 1993 Tax Ct. Memo LEXIS 153; 65 T.C.M. (CCH) 2365; April 8, 1993, Filed *153 Decision will be entered under Rule 155. For petitioner: Francis M. Smith and Michael M. Billion. For respondent: J. Anthony Hoefer. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined a $ 678,103 Federal estate tax deficiency. The primary issue concerns the value, for estate tax purposes, of the cause of action against Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). The litigation involved claims for compensatory and punitive damages in a security churning [1] case. We also consider an evidentiary issue concerning the subject matter of an expert's report and the amount of reliance to be given to it in this case. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of *154 facts is incorporated by this reference. Ethlyn Davis (decedent) died on November 4, 1986, at a time when she resided in Huron, South Dakota. Don M. Davis, the executor of decedent's estate, resided in Florida when the petition in this case was filed. In 1972, decedent's husband, Leonard Davis, opened an account for decedent with Merrill Lynch, at its Minneapolis office. Mr. Davis died in 1976. Between 1972 and 1981, Edward Marks (Marks), a Merrill Lynch account executive, was responsible for decedent's account. Marks was aware that decedent was an unsophisticated investor and that she completely trusted and relied on the advice of her Merrill Lynch account executives. In May 1981, when decedent was 87 years old, Marks transferred decedent's account to a different account executive, Steven Ulrich (Ulrich). From early 1982 to August 1984, Ulrich churned decedent's account, making between 106 and 141 unauthorized trades. Merrill Lynch earned $ 43,468 in commissions from the unauthorized trading. During the time the account was being churned, decedent realized a net profit exceeding $ 53,000. If no trades had been made on decedent's account for the same period, it was contended *155 that the account would have realized over $ 100,000 of net profit. On August 21, 1985, decedent brought a suit against Merrill Lynch in the United States District Court for the District of South Dakota. At the time the suit was commenced, Merrill Lynch was a subsidiary of a company with revenues in excess of $ 9,600,000,000 and a net worth approaching $ 2,900,000,000. Decedent's suit alleged that Merrill Lynch had committed fraud and deception in violation of section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5, was guilty of common law fraud and deceit, had breached its fiduciary duty, and had converted decedent's funds to its own use. Decedent sought $ 122,674.30 in compensatory damages and $ 6 million in punitive damages. Merrill Lynch defended the action contending that the account was not excessively traded; the law was not clear that there was a fiduciary relationship between it and decedent; there were no actual damages because the account increased in value over the period in controversy; and that the law was not clear that punitive damages could be awarded for lack of actual damages, or in Securities Exchange Act cases, or against a principal for vicarious *156 acts of its agent. Decedent died on November 4, 1986, and her estate, represented by Don M. Davis, was substituted as plaintiff in the cause of action against Merrill Lynch. When decedent died, the pretrial discovery had not been completed in the Merrill Lynch litigation. The estate tax return (Form 706) was filed February 9, 1988, and listed the Merrill Lynch litigation as a miscellaneous asset with a zero value. On or about September 23, 1985, Merrill Lynch offered to settle the litigation for $ 50,000. On April 9, 1987, Merrill Lynch made another offer in the amount of $ 80,000. Neither offer was accepted and the case proceeded to trial. On May 4, 1987, decedent's estate received a jury verdict of $ 20,000 in compensatory damages and $ 2,250,000 in punitive damages. On July 21, 1987, the District Court ordered decedent's estate to accept a $ 1,850,000 remittitur (reducing the punitive damages to $ 400,000) or have another trial only on the issue of damages. The estate rejected the remittitur and there was a second trial. On August 12, 1988, decedent's estate received a second jury award of $ 100,000 in compensatory damages and $ 2 million in punitive damages and judgment *157 was entered accordingly. On June 15, 1990, the United States Court of Appeals for the Eighth Circuit affirmed the judgment of the District Court. On November 16, 1990, pending appeal to the United States Supreme Court, the District Court approved a $ 2 million settlement subject to 45 percent attorney's fees. After fees and expenses, decedent's estate received $ 1,063,059, which was later adjusted to $ 1,065,555. In the notice of deficiency, respondent determined that the date-of-death value of decedent's interest in the lawsuit against Merrill Lynch was $ 1,100,000. Petitioner contends that the date-of-death value was $ 62,255. OPINION Before considering the valuation issue, we address an evidentiary matter concerning petitioner's expert witness. With the exception of the report and testimony of petitioner's expert witness, the evidence in this case was fully stipulated. The report of Deming Smith (Smith), an expert witness on behalf of petitioner, was offered at trial. Smith's expertise was acknowledged and his expert witness report was received into evidence over respondent's objections. [2]
*158 Respondent objected to the report on the grounds that Smith had no expertise in churning cases and that his report, in essence, is a brief. Petitioner asserted that Smith, as an experienced trial lawyer, could provide the Court assistance by providing an evaluation method for our use in determining the value of a cause of action for damages. Rule 702 of the Federal Rules of Evidence provides for the testimony of an expert witness if the expert's specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue". Smith has practiced as a trial lawyer, specialized in civil litigation in Sioux Falls, South Dakota, since 1946. In that time, Smith has handled and/or evaluated thousands of civil litigation cases. We find that Smith has expertise in evaluating lawsuits. Smith, however, has no specialized expertise in the area of securities and churning litigation. Accordingly, Smith's methodology in valuing a lawsuit will be considered in our determination of value. The remainder of Smith's report and testimony will be treated as though it was part of a trial brief or memorandum on behalf of petitioner. On other occasions, the report *159 of a lawyer has been found helpful in determining the value of a cause of action. See Estate of Lennon v. Commissioner, T.C. Memo. 1991-360; Crossmore v. Commissioner, T.C. Memo. 1988-494. We note, however, that expert testimony is received to assist the trier of fact and is not binding to the extent it is found contrary to the court's own judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989)
For Federal estate tax purposes, the value of the gross estate is determined by including the value at the time of death of all property in which decedent had an interest, real or personal, tangible or intangible. Secs. 2031(a), 2033. [3] The value of the property is the fair market value on the date of death. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). *160 Valuation is based on facts reasonably known at the date of valuation. This Court has adopted the rule that "subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation." Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). Having set forth these rather familiar principles for determining fair market value, we must admit that the valuation of a lawsuit continues to be a unique and abstract endeavor. A lawsuit is not the type of asset, either tangible or intangible, which readily fits within the categories of things regularly traded in commerce. Furthermore, the valuation process for lawsuits does not appear to be as objectively achievable as other types of assets. The concepts underlying *161 lawsuits for punitive damages make valuation questions even more elusive and difficult to ascertain with a high degree of certainty. Respondent's determination that the value of the lawsuit was $ 2,100,000 seems to be derived from the amount of the judgment affirmed by the Court of Appeals, almost 4 years after decedent's death. In reaching that determination, it appears that respondent did not reduce the value by the amount of legal fees and expenses, which must necessarily be considered. Respondent has provided no rationale for the contention that $ 2,100,000 is the value. The amount of recovery subsequent to the date of death does not control the value of the cause of action. American National Bank & Trust Co. v. Commissioner, 594 F.2d 1141, 1144-1145 (7th Cir. 1979); Estate of Biagioni v. Commissioner, T.C. Memo. 1981-660. Petitioner's expert's (Smith) methodology began with the amount of the claim as if there were no contest and then discounted it for: (1) Costs of litigation, (2) hazards of litigation, and (3) timely delay in receiving funds. [4] This same type of methodology was utilized and met with approval *162 in Estate of Cobb v. Commissioner, T.C. Memo. 1982-571. We believe that this approach is an acceptable method to value the portion of decedent's cause of action for compensatory damages. The amount of the claim for compensatory damages set forth in the complaint was $ 122,674.30. This was the amount of the claim if there were no contest. We first adjust this amount to reflect the amount of actual damages, because if there was a contest, the damage claim would be automatically reduced to reflect actual damages. Smith determined this amount to be $ 107,853. The $ 107,853 was derived, as follows: Value of account if no churning had occurred
$ 211,976 Value of account after churning
156,341 Difference
55,635 Money added to account by decedent
16,750 Churning commissions charged against account
43,468 Amount repaid by broker
(8,000)
Total compensatory claim for damages    107,853 *163 We note that respondent did not specifically dispute Smith's computation or method, but instead argued that his entire report was a brief. In some respects, we find Smith's preliminary compensatory damage analysis to be persuasive. Accordingly, we accept the $ 107,853 amount as the first adjustment in the compensatory damage claim analysis. Next, we reduce that amount for costs of litigation. The legal fees were figured at one-third, which after 6-percent sales tax would be about 35.3 percent. Adding estimated trial expenses we arrive at a 45-percent discount. Accordingly, after taking into account attorney's fees and costs of litigation, the compensatory damage claim would be reduced to $ 59,319; i.e., $ 107,853 x (1 - 45%). Based upon the relative ease in proving the churning, our analysis of South Dakota precedent, and the acute nature of the facts, there were only negligible risks or hazards of success in litigating the compensatory damage claim. We also note that Merrill Lynch offered to settle for $ 50,000 and then for $ 80,000 prior to trial. Those offers likely reflect a recognition that compensatory damages were a near certainty, but reflect little, if any, acknowledgement *164 of the potential for punitive damages. Accordingly, we use a 5-percent risk factor in connection with the litigating hazards of the compensatory damage claim. Therefore, we further reduce the value to account for the risk to $ 56,353; i.e., $ 59,319 x (1 - 5%). Additionally, we discount potential recovery for time delay. Smith used a 2-year delay factor at a 10-percent discount rate to account for the time delay. We also discount the amount for 2 years at a 10-percent discount rate in reaching the fair market value of $ 46,176 for the compensatory portion of the decedent's claim. Punitive damages, unlike compensatory damages, are awarded in connection with the defendant's culpable state of mind. The culpability is usually founded on acts which are malicious, oppressive, wanton, or fraudulent, or involve conscious disregard for the rights of others. S.D. Codified Laws Ann. sec. 21-3-2 (Michie 1987). [5] Moreover, the purpose of punitive damages is to punish and deter the defendant and like-minded persons from committing similar acts in the future. [6] Because the main purpose is not to compensate the plaintiff or injured party, our analysis follows a different approach than we *165 used for compensatory damages. First, we note that a plaintiff has no right to punitive damages. This is so even if the defendant acted with a culpable state of mind. [7] The amount of punitive damages is completely discretionary and the finder of fact can take into account the purpose(s) of the award, including the extent of injury, the wealth of the defendant, the plaintiff's litigation expenses, the probability *166 of repetition of the conduct, etc. In South Dakota, punitive damages are not allowed without the prerequisite of a compensatory damage award. Speck v. Anderson, 349 N.W.2d 49, 51 (S.D. 1984); Johnson v. Kirkwood, Inc., 306 N.W.2d 640, 643 (S.D. 1981). At the times of decedent's claim, lawsuit, and death, the courts of South Dakota had not yet considered: (1) Whether there was a fiduciary relationship between a stockbroker and client, and (2) whether a principal (Merrill Lynch) could be vicariously liable for punitive damages awarded in connection with the acts of its agent. [8]
*167 These concepts, however, may not have meaningful relevance to the hazards in pursuing punitive damages because no information was provided regarding unsuccessful punitive damage litigation in South Dakota or churning litigation in Federal courts. Moreover, there does not appear to be any generally established principle that punitive damages bear any direct numerical relationship to compensatory damages. With these impediments in mind and recognizing the paucity of information available we slide down this slippery slope to the point where we grasp the maxim that "Valuation for estate tax purposes frequently involves difficult and somewhat imprecise calculations." Estate of Biagioni v. Commissioner, T.C. Memo. 1981-660 (citing Estate of Smith v. Commissioner, 57 T.C. 650 (1972), affd. 510 F.2d 479 (2d Cir. 1975)). Based upon the facts, case precedent, and accounting for attorney's fees and costs of litigation, we find the fair market value of decedent's claim for punitive damages was $ 277,056 as of the date of death. Therefore, in light of all the evidence presented, we find that the fair *168 market value, as of the date of death, of decedent's cause of action against Merrill Lynch was $ 323,232 ($ 46,176 compensatory damages and $ 277,056 punitive damages). Decision will be entered under Rule 155. Footnotes
1. Churning occurs when an account executive who directs the account's trades initiates transactions that are excessive, for personal gain. Churning can never occur with respect to any transaction directed by the customer.↩
2. It is noted that respondent did not offer an expert witness in this case.↩
3. All section references are to the Internal Revenue Code as in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
4. The order in which the discounts are applied will have some effect upon the final value determined. Although Mr. Smith's order of discounts fits within the pattern of his methodology, we note that it does not represent the only possible approach or order that could have been used.↩
5. S.D. Codified Laws Ann. sec. 21-3-2 (Michie 1987) contains the following: In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.↩
6. Schleuter & Redden, Punitive Damages, secs. 1.3(E), 2.2 (2d ed. 1989).↩
7. Id.↩ sec. 2.1(C).
8. At the time of decedent's death the Supreme Court of South Dakota had upheld punitive damages in the following multiples: Punitive Damages
Compensatory Damages
Multiple
$ 6,600
$ 2,200.00
3.0
100,000
244,922.99
0.4
50,000
4,574.46
10.9
20,000
3,177.84
6.3
7,000
200.00
35.0
Smith's report also contained a list of six cases decided by Federal Courts of Appeals involving churning where plaintiffs were successful in obtaining punitive damages against the stock brokerage companies, as follows: Punitive Damages
Compensatory Damages
Multiple
$ 300,000
$ 46,675
6.4
1,500,000
175,000
8.6
200,000
37,000
5.4
100,000
54,000
1.8
16,000
30,000
0.5
66,666
24,600
2.7
We note that neither party provided references for South Dakota churning cases other than the one being valued. Additionally, we accepted petitioner's expert's case references for punitive damages in South Dakota and punitive damages in churning cases in Federal Courts of Appeals. Respondent did not disagree with these citations or provide additional references from which other or contradictory conclusions could be drawn.↩