**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 98-60241
_____

ALGERINE ALLEN SMITH, Estate of
Deceased; JAMES ALLEN SMITH, EXECUTOR,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

No. 98-60313
_____

COMMISSIONER OF INTERNAL REVENUE,

Petitioner-Appellant,

versus

ALGERINE ALLEN SMITH, Estate of
Deceased; JAMES ALLEN SMITH, EXECUTOR,

Respondent-Appellee.

_____

Appeals from the United States Tax Court
_____

December 15, 1999

Before WIENER, DeMOSS and PARKER, Circuit Judges.

WIENER, Circuit Judge:

In this complex federal tax case, involving both estate and income tax issues, Petitioner-Appellant Estate of Algerine Allen Smith (the "Estate") appeals an adverse decision of the Tax Court. At the time of her death, Algerine Allen Smith (the "Decedent") was

one of many defendants in a lawsuit brought by Exxon Corporation that arose out of royalty provisions in numerous oil and gas leases. Exxon had overpaid royalty owners, including the Decedent, and was suing to recoup the overpayments.

Four questions are presented in this appeal: (1) As of what date is a claim against the Decedent that is deductible from gross estate under § 2053(a)(3)[1] to be valued? (2) How and to what extent, if any, does an estate's inchoate right to an _income_ tax deduction (or refund) under § 1341(a) –– a right that ripens only when and if an estate makes a payment on a claim deducted under § 2053(a)(3) –– affect the § 2053(a)(3) _estate_ tax deduction allowed to the estate for such claim? (3) Assuming that, in computing its estate taxes, an estate is entitled to and does take a deduction for a claim in an amount that ultimately proves to be greater than the sum it eventually pays to the claimant whose claim has generated the § 2053(a)(3) deduction, will the estate incur discharge-of-indebtedness income under § 61(a)(12)? And, (4) In this case, did the Tax Court abuse its discretion when it denied the Estate's motion to amend its petition after the case had already been submitted for decision on stipulated facts?

In answer to the first two questions, we hold that the claim generating the estate tax deduction under § 2053(a)(3) –– as well as the § 1341(a) income tax relief that will necessarily attend any payment by an estate on that claim –– must be valued as of the date

_____

[1]All statutory references are to the Internal Revenue Code of 1986 as amended, Title 26 of the United States Code.

of the death of the decedent and thus must appraised on information known or available up to (but not after) that date. We therefore vacate and remand with instructions to the Tax Court that it admit and consider evidence of pre-death facts and occurrences that are relevant to the date-of-death value of Exxon's claim, without admitting or considering post-death facts and occurrences such as the Estate's settlement with Exxon, which occurred some fifteen months after Decedent's death. As for the third question, we reject the assertion of Respondent-Appellee the Commissioner of Internal Revenue (the "Commissioner") that if the amount the Estate is allowed to deduct under § 2053(a)(3) exceeds the amount it ultimately pays to Exxon, the difference will constitute discharge-of-indebtedness income to the Estate in the year of the payment. Finally, we hold that the Tax Court did not abuse its discretion when it refused to consider the Estate's late-filed motion to amend its petition.

**I**

**FACTS AND PROCEEDINGS**

In 1970, Decedent and two aunts leased tracts of land located in Wood County, Texas, to Exxon's predecessor, Humble Oil & Refining Company ("Humble Oil"). The lessors were to receive royalty payments calculated as a fraction of the price received by the lessee for any oil and gas produced from the leased tracts. The lease agreements provided that if the price of the minerals produced under the lease were ever regulated by the government, royalties would be adjusted accordingly. When Decedent's aunts

3

died, she succeeded to their interests.

The tracts that Decedent and her aunts leased to Humble Oil, together with a number of other tracts in Wood County, were collectively designated as the Hawkins Field Unit ("HFU"). After Decedent and her aunts had entered into the lease agreements, Exxon acquired Humble Oil. In 1975, approximately 2,200 HFU royalty owners and 300 working interest owners entered into a unitization agreement with Exxon. Under this agreement, all HFU tracts were aggregated into a functional whole and Exxon was designated as the sole operator of the unit.[2] In addition to being unit operator, Exxon was the largest single royalty owner in the HFU.

During the early years of the HFU's operation, the federal government regulated the price of domestic crude oil. In 1978, the Department of Energy ("DOE") filed suit against Exxon (the "DOE Litigation") in the United States District Court for the District of Columbia (the "D.C.D.C."), claiming that Exxon had misclassified the oil produced from the HFU and thus had overcharged its customers, in contravention of the federal price regulations. Exxon continued to pay the HFU interest owners royalties based on the price that the DOE had challenged as excessive, but in 1980 Exxon began withholding a portion of royalties to offset its potential future liability from the DOE Litigation.

That same year, a group of the royalty owners sued Exxon (the "Jarvis Christian Litigation") in federal district court in Texas,

---

[2]For a detailed account of the history of the HFU and federal regulation of oil prices during this period, see United States v. Exxon Corp., 773 F.2d 1240, 1250-53 (Temp. Emer. Ct. App. 1985).

asserting that Exxon was required to pay them the full amount of their royalties.  Early in 1981, Decedent intervened as a plaintiff in the Jarvis Christian Litigation.

Three years later, in the DOE Litigation, the D.C.D.C. held that Exxon had violated the federal price-control regulations.[3] The court determined that Exxon was liable, in restitution, for over $895 million.[4]  In February of 1986 — following affirmance of the D.C.D.C.'s judgment and shortly after the Supreme Court denied certiorari — Exxon paid the judgment, which, including both pre- and post-judgment interest, totaled approximately $2.1 billion.

In 1988, Exxon sued the HFU royalty owners, seeking to recoup a portion of the $2.1 billion judgment.  In its complaint, Exxon alleged that it was entitled to contribution from the royalty owners under alternative legal theories, including federal common law, federal statutory law,[5] and several state common law causes of action.  In that suit, which was consolidated with the Jarvis Christian Litigation, the royalty owners vigorously defended against Exxon's claim.  They argued that Exxon's complaint failed to state a cause of action under either federal common law or

_____

[3]See United States v. Exxon Corp., 561 F. Supp. 816 (D.D.C. 1983).

[4]The judgment was in favor of the United States Treasury. The Treasury, under guidelines established by Congress, ultimately distributed the judgment to several States and Territories.  See United States v. Exxon Corp., 773 F.2d 1240, 1246 (Temp. Emer. Ct. App. 1985).

[5]Exxon alleged that it had a cause of action under both 12 U.S.C. §1904 (The Economic Stabilization Act of 1970) and 15 U.S.C. §754(a)(1) (The Emergency Petroleum Allocation Act of 1973).

federal statutory law; and, alternatively, that if Exxon had stated a claim, the royalty owners were not liable to Exxon because (1) Exxon was equitably estopped —— by the wrongful nature of its own conduct —— from recovering in restitution, and (2) Exxon had not actually suffered a loss despite having paid the judgment.

In August 1989, fifteen months before Decedent's death, the district court that was adjudicating the Jarvis Christian Litigation ruled that Exxon had "an implied cause of action [against the HFU royalty owners, including the Decedent] under federal common law for reimbursement."[6]

In January 1990, the royalty owners, including Decedent, moved for summary judgment. The main thrust of the motion was that Exxon had reaped profits far exceeding the judgment that it had paid in the DOE litigation, both as the largest royalty owner in the HFU and as unit operator. According to the royalty owners' motion, the established tenets of the law of restitution prevent Exxon from recouping a sum exceeding the losses that it had suffered; and, contended the royalty owners, as Exxon had suffered no losses, its potential recovery was nil.

Decedent died on November 16, 1990. At the time of her death, the royalty owners' Motion for Summary Judgment was still pending. Exxon subsequently filed its own motion for summary judgment, and in February 1991 —— after Decedent's death but before the filing of her estate tax return (Form 706) —— the district court granted

---

[6]Exxon Corp. v. Jarvis Christian College, 746 F. Supp. 652, 655 (E.D. Tex. 1989).

summary judgment in favor of Exxon. The court held that (1) the royalty owners were liable to Exxon; (2) Exxon's damages would equal the difference between the regulated price of oil and the higher price Exxon had charged its customers; and (3) Exxon could recover interest on its damages for the period beginning on the date that Exxon had paid the judgment in the DOE litigation (February 27, 1986) and ending on the date that the interest owners paid Exxon. The court expressly did not allow Exxon to collect interest accruing before it paid the judgment in the DOE litigation, reasoning that to do so would be "unjust and inequitable" because Exxon could have avoided this portion of the judgment by paying the DOE earlier. The court then referred the calculation of damages to a special master. Exxon claimed that it was owed a total of $2.48 million by the Estate.[7]

Decedent's Form 706 was filed in July, 1991, approximately eight months after her death and five months after the summary judgment favorable to Exxon but while the Special Master was calculating the quantum of Exxon's claims. Pursuant to § 2053(a)(3), Decedent's Form 706 included a $2.48 million deduction for Exxon's claim against the Estate. In March 1992, fifteen months after Decedent's death and nine months after the filing of her Form 706, the Estate paid Exxon $681,840 to settle the case, a sum equal to 27.5 percent of the § 2053(a)(3) deduction claimed by the Estate.

The Commissioner determined that, as Exxon's claim was

---

[7]The exact figure is $2,482,719.

disputed on the date of Decedent's death, the Estate was entitled to deduct only the amount paid in settlement ($681,840), even though that was not done until fifteen months after Decedent's death. Accordingly, the Commissioner issued a notice of deficiency for $663,785 in estate taxes, based in part on the reduced deduction.

Subsequently, the Commissioner issued a second notice of deficiency, asserting in the alternative an income tax deficiency for 1992, the year of the settlement payment. The Commissioner reasoned that if the Estate were allowed an estate tax deduction for the full $2.48 million, despite paying only $681,840 to Exxon, it would have realized income from the discharge of indebtedness. The discharge-of-indebtedness income was calculated to be $1,800,879, the difference between the claimed estate tax deduction (approximately $2.48 million) and the post-death settlement ($681,840).

The Estate filed two petitions for redetermination in the Tax Court, contesting the Commissioner's notices of deficiencies. The Tax Court consolidated the two petitions, and the parties submitted the case on stipulated facts.

After the parties had supplemented their stipulation of facts and submitted the case to the Tax Court for decision, the Estate filed a motion seeking leave to amend one of its petitions. The Commissioner contested the Estate's late-filed motion to amend. Siding with the Commissioner, the Tax Court denied the Estate's motion.

On the merits, the Tax Court ultimately held that because (1) Exxon's claim was neither certain nor enforceable as of the decedent's death, the estate was entitled to deduct only the post-death settlement payment of $681,840; and (2) the income tax benefit the estate derived under § 1341(a) for paying Exxon $681,840 in settlement constituted property of the Estate, as of Decedent's death. As the court ruled that the Estate's deduction was limited to the value of the settlement, i.e., $681,840, rather than $2.48 million, the Commissioner's protective assessment of discharge-of-indebtedness income was moot, so the Tax Court did not address that issue. The estate timely filed this appeal.

## II

## ANALYSIS

A.   Jurisdiction & Standard of Review

We have jurisdiction pursuant to 26 U.S.C. § 7482 to hear appeals from the Tax Court. We review the Tax Court's findings of fact for clear error; questions of law are reviewed de novo.[8] Construction of the Internal Revenue Code is a question of law.[9]

B.   Deduction for Claims Against the Estate

A tax is imposed on the transfer of the "taxable estate" of every decedent who is a citizen or resident of the United States.[10]

---

[8]See § 7482(a) (courts of appeals review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts . . . ."); Street v. Commissioner, 152 F.3d 482, 484 (5th Cir 1998).

[9]See Grigg v. Commissioner, 979 F.2d 383, 384 (5th Cir. 1992).

[10]See § 2001(a).

The "taxable estate" is the "gross estate"[11] less those deductions allowable under §§ 2051 through 2056.[12]  The first issue in this case is whether post-death facts and occurrences can be considered in valuing the deduction authorized by § 2053(a)(3) for "claims against the estate . . . as are allowable by the laws of the jurisdiction . . . under which the estate is being administered."

The Tax Court held, and the Commissioner urges on appeal, that the Estate's deduction is limited to the $681,840 that the Estate ultimately paid, fifteen months after death, to settle Exxon's claim.  This conclusion is grounded on the facts that liability and quantum of the claim were still being litigated at Decedent's death, and the compromise which determined liability and quantum had not yet been achieved.  The Estate counters that post-death events are irrelevant, contending that, because Exxon's claims constituted "enforceable contractual rights" existing as of Decedent's death, the full $2.48 million of Exxon's claim is deductible.  The Tax Court did not hold, and the Commissioner has never argued, that the Estate is not entitled to any deduction at all; only that the amount is not that being asserted by Exxon at Decedent's death but rather the amount paid in settlement fifteen months later.  Thus the question presented is not <u>whether</u> a deduction is available, but rather what is the correct amount of

---

[11]The gross estate consists of "all property, real or personal, tangible or intangible, wherever situated," and the Code explicitly directs that the gross estate is to be "value[d] at the time of [the taxpayer's] death."  <u>Id.</u> § 2031.

[12]<u>See</u> § 2051.

the deduction.

Although we are persuaded that, on these facts, the Commissioner is not permitted to consider —— much less rely exclusively on —— the amount of the post-death settlement of the Exxon claim when valuing Decedent's allowable estate tax deduction, we are also persuaded that the estate is not entitled to deduct the full amount that was being claimed by Exxon at Decedent's death. Rather, for the reasons that follow, we conclude that the correct analysis requires appraising the value of Exxon's claim based on the facts as they existed as of death.

Section 2053(a)(3) is silent regarding the "as of" date for valuing claims against an estate. The Commissioner cites Treasury Regulation ("Reg.") § 20.2053-1(b)(3), which allows a deduction for a claim "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid." The Commissioner urges that because the "reasonable certainty" and "will be paid" requirements were not met as of the date of death, post-death events can and should be considered in establishing the value of the claim. The Estate, on the other hand, emphasizes that Reg. § 20.2053-4 allows a deduction for those "personal obligations of the decedent existing at the time of his death."[13] According to the Estate, this temporal reference establishes the precise date as of which claims are to be valued. Thus, insists the Estate, because the district court had held that Exxon had a cause of action, and because Exxon was asserting a debt of $2.48 million as

---

[13]Id. § 20.2053-4 (emphasis added).

of Decedent's death, this is the proper amount of the deduction.

The most that can be discerned from these Regulations is that the situation we now face is not expressly contemplated, and that there is, arguably, language that supports the opposite contentions of the parties. Finding no definitive answer in the statute or regulations, we turn to the case law.

Ithaca Trust Co. v. United States is the Supreme Court's clearest statement of the general rule that "[t]he estate so far as may be is settled as of the date of the testator's death."[14] Ithaca Trust involved the value of a charitable remainder subject to a life estate. The question before the Court was whether the charitable remainder became more valuable (as a deduction from the gross estate) because the life tenant, who survived the testator, died before reaching her actuarial life expectancy. The Court, per Justice Holmes, held that the estate tax is a levy on the transfer of property, a discrete act, and that

> the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future; and the value is no less real at that time if later the prophecy turns out false than when it comes out true. Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables. Our opinion is not changed by the necessary exceptions to

---

[14]279 U.S. 151, 155 (1929).

the general rule specifically made by the Act.[15] As many courts have noted, decisions following Ithaca Trust Co. are irreconcilable.[16] In the context of the §2053(a)(3) "claims against the estate" deduction, some courts have strictly adhered to the Supreme Court's directive to value deductions based on the "more or less certain prophecies of the future"[17] existing on the date of death;[18] others have not.[19]

Propstra v. United States from the Ninth Circuit is a leading case that strictly applies the date-of-death valuation principle to a claim against the estate.[20] As of his death, the decedent in

---

[15]Ithaca Trust Co., 279 U.S. at 155 (citations omitted)(emphasis added).

[16]See, e.g., Estate of Kyle v. Commissioner, 94 T.C. 829, 849 (1990) ("all of the cases in this field dealing with post-death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision." (quoting Estate of Van Horne v. Commissioner, 78 T.C. 736-37 (1982), aff'd 720 F.2d 1114 (9th Cir. 1983)).

[17]Ithaca Trust Co., 279 U.S. at 155.

[18]In the following cases interpreting § 2053(a)(3) or its predecessors, the courts refused to consider post-death events: Estate of Van Horne, 720 F.2d 1114 (9th Cir. 1983); Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Green v. United States, 447 F. Supp. 885 (N.D. Ill. 1978); Estate of Lester v. Commissioner, 57 T.C. 503 (1972); Russell v. United States, 260 F. Supp. 493 (1966); Winer v. United States, 153 F. Supp. 941 (1957).

[19]In the following cases the courts did consider post-death events: Estate of Sachs v. Commissioner, 856 F.2d 1158 (1988); Jacobs v. Commissioner, 34 F.2d 233 (1929); Estate of Kyle v. Commissioner, 94 T.C. 829 (1990); Estate of Hagmann v. Commissioner, 60 T.C. 465 (1973), aff'd per curium, 492 F.2d 796 (5th Cir. 1974); Estate of Cafro v. Commissioner, T.C. Memo. 1989-348, 1989 WL 79310; Estate of Quintard v. Commissioner, 62 T.C. 317 (1974).

[20]680 F.2d 1248 (9th Cir. 1982).

Propstra owned property encumbered with liens exceeding $400,000. More than two years later, his estate paid the lien holder approximately $135,000 in full satisfaction of its claims. The Commissioner argued, as he does here, that the estate was permitted to deduct only the amount actually paid. The court disagreed: "We rule that, as a matter of law, when claims are for sums certain and are legally enforceable as of the date of death, post-death events are not relevant in computing the permissible deduction."[21]

The Propstra court cited three reasons for its conclusion. First, it found significant a change in the wording of the relevant Code section when Congress enacted the Internal Revenue Code of 1954. Prior to 1954, the predecessor to § 2053(a) had authorized deduction for claims "as are allowed by the laws of the jurisdiction . . . under which the estate is being administered."[22] Courts were divided regarding whether the use of "allowed" meant that the estate actually had to pay the claim for it to be deductible.[23] In the 1954 re-enactment of the Code, "allowed" was replaced with "allowable." The Propstra court found this change indicative of Congress's preference for the line of cases that measured a claim's viability and value as of the date of death

---

[21]Propstra, 680 F.2d at 1254. We acknowledge that the Propstra court drew a distinction between "disputed or contingent" claims on one hand, and "certain and enforceable" claims on the other. Id. at 1253. It stated, in dicta, that post-death events are relevant in computing the allowable deduction in the case of "disputed or contingent" claims, but the court gave no indication of the meaning that it assigned to these imprecise terms.

[22]Id. (emphasis in original; citing § 812(b)(3) (1939)).

[23]Id. at 1254-55.

**14**

without imposing the additional element of actual post-mortem payment by the estate.[24]

Second, the Propstra court reasoned that its holding was supported by Treasury Regulation § 20.2053-4, which allows an estate to deduct "personal obligations of the decedent existing at the time of [the decedent's] death."[25] Finally, the court reasoned that its holding comported with the teaching of Ithaca Trust.

The Ninth Circuit again applied the date-of-death valuation principal to a claim against an estate in Estate of Van Horne v. Commissioner.[26] The decedent in Van Horne was obligated, pursuant to a valid judgment, to make support payments to her ex-husband for the duration of his life, notwithstanding either his remarriage or her death. The judgment provided that if the decedent predeceased her ex-husband, the support obligation would be payable by her estate. She predeceased him, and shortly after her death — but far short of his actuarial life expectancy — her ex-husband died. Consequently, the estate's ultimate liability on the claim was only a small fraction of the actuarial prediction as of her death. Consistent with Ithaca Trust and Propstra, the Van Horne court held that "legally enforceable claims valued by reference to an actuarial table meet the test of certainty for estate tax purposes. Because decedent's spousal support obligation meets that test, it

---

[24]Id. at 1254-55. See also Winer v. United States, 153 F. Supp. 941, 943 (S.D.N.Y. 1957).

[25]Emphasis added.

[26]720 F.2d 1114, 1117 (9th Cir. 1983).

is subject to the Propstra rule."[27]

In sharp contrast to the holdings of the Ninth Circuit in both Propstra and Van Horne, the Eighth Circuit squarely held in Estate of Sachs v. Commissioner that "[i]n this Circuit . . . the date-of-death principle of valuation does not apply to claims against the estate deducted under §2053(a)(3)."[28] Because of events that occurred before Sachs's death, his estate owed federal income tax. The estate paid the income tax, and deducted the amount paid as a claim against the estate under § 2053(a)(3). Congress subsequently amended the Internal Revenue Code; the amendment applied retroactively, resulting in forgiveness of the income tax liability that the estate had paid; and the estate received a full refund. The Commissioner argued that the § 2053(a)(3) estate tax deduction should be disallowed, but the Tax Court disagreed. It held instead that the estate was permitted to deduct the subsequently-refunded tax liability because it existed at the decedent's death, and the post-death statutory amendment effecting a retroactive repeal could not be considered.[29]

The Eighth Circuit reversed, holding that "an estate loses its

---

[27]720 F.2d 1114, 1117 (9th Cir. 1983).

[28]856 F.2d 1158, 1160 (8th Cir. 1988). Accord Commissioner v. Shively, 276 F.2d 372 (2d Cir. 1959) ("We hold that where, prior to the date on which the estate tax return is filed, the total amount of a claim against the estate is clearly established under state law, the estate may obtain under Section 812(b)(3) [predecessor to § 2053(a)(3)] no greater deduction than the established sum, irrespective of whether this amount is established through events occurring before or after the decedent's death.")(emphasis added).

[29]See 88 T.C. 769, 779-783 (1987), rev'd 856 F.2d 1158 (8th Cir. 1988).

§ 2053(a)(3) deduction for any claim against the estate which ceases to exist legally."[30]  The court acknowledged that its holding was inconsistent with Propstra and Van Horne, but held that it was bound by its prior holding in Jacobs v. Commissioner[31] — a case decided a mere five months after Ithaca Trust.

The Sachs court first distinguished the valuation of a charitable bequest — the deduction at issue in Ithaca Trust — from the valuation of claims against the estate deductible under § 2053(a)(3).  The Sachs court reasoned that the value of charitable bequests, unlike claims against the estate, "must be determined as of the date of [death] because any other method would permit estates a one-sided advantage."[32]  It then found that Ithaca Trust's reliance on  YMCA v. Davis,[33] another case involving a charitable bequest, indicated that the holding in Ithaca Trust was supported by concerns specific to that context, concerns not implicated by the § 2053(a)(3) deduction for claims against the estate.[34]  The

---

[30]856 F.2d 1158, 1161.

[31]34 F.2d 233 (8th Cir.), cert. denied, 280 U.S. 603 (1929).

[32]Id. at 1161.  The court was correct on this point because if date-of-death valuation were not the rule for charitable bequests, exceptions to the use of the actuarial tables would always benefit the taxpayer: Only when the life tenant dies prior to filing the estate tax return (and thus before the life tenant's actuarial life expectancy) would an exception be made.  Such exceptions, if they were permitted, would always result in a greater value being assigned to the charitable remainder and, correspondingly, a greater estate tax deduction.

[33]264 U.S. 47 (1924).

[34]856 F.2d at 1161-62.  We note that, in support of the proposition that "[t]he tax is on the act of the testator not the receipt of property by the legatees," Ithaca Trust, 279 U.S. at

**17**

court in Estate of Sachs concluded that "none of the considerations which dictate date-of-death valuation of charitable bequests applies to claims against the estate."[35]

We are persuaded that the Ninth Circuit's decisions in Propstra and Estate of Van Horne correctly apply the Ithaca Trust date-of-death valuation principle to enforceable claims against the estate. As we interpret Ithaca Trust, when the Supreme Court announced the date-of-death valuation principle, it was making a judgment about the nature of the federal estate tax —— specifically, that it is a tax imposed on the act of transferring property by will or intestacy and, because the act on which the tax is levied occurs at a discrete time, i.e., the instant of death, the net value of the property transferred should be ascertained, as nearly as possible, as of that time. This analysis supports broad application of the date-of-death valuation rule. We think that the Eighth Circuit's narrow reading of Ithaca Trust, a reading that limits its application to charitable bequests, is unwarranted.

That there are, as the Ithaca Trust Court recognized, statutory exceptions to this rule[36] does not command or even permit further judge-made exceptions. To the contrary, it suggests that when Congress wants to derogate from the date-of-death valuation

---

155, the Court cited three cases in addition to YMCA v. Davis, 264 U.S. 47 (1924), none of which involved charitable bequests.

[35]856 F.2d at 1162.

[36]Current exceptions to date-of-death valuation include §§ 2053(a)(1) (funeral expenses), 2053(a)(2) (estate administration expenses), and 2054 (casualty losses).

principle it knows how to do so.  We note in passing that since Ithaca Trust, Congress has thrice reenacted the entire Internal Revenue Code and has made countless other modifications to the statute, but has never seen fit to overrule Ithaca Trust legislatively.[37]  We decline the Commissioner's invitation to rewrite the law ourselves.[38]

Other courts (including the Tax Court in this case) that have delved into this confused jurisprudence have perceived a distinction between (1) cases concerning the valuation of claims that are certain and enforceable as of death, and (2) cases concerning disputed or contingent claims, the enforceability of which is unknown as of death.[39]  Claims falling into the first category are —— according to the courts that have accepted this distinction —— deductible at their date-of-death value.  Claims falling into the second category, by contrast, are deductible in the amount of their ultimate resolution.  In the instant case, the Tax Court classified Exxon's claim as one of uncertain validity and enforceability on the date of death and, accordingly, relied on post-death facts, specifically, the settlement.

Although this dichotomy, which distinguishes between

---

[37]See, e.g., Orr v. United States, 343 F.2d 553, 557 (5th Cir. 1965) ("In 1954 Congress reenacted the [Internal Revenue Code] using the same language.  The prior construction is of some value in determining the meaning of the new statute.").

[38]See Leggett v. United States, 120 F.3d 592, 598 (5th Cir. 1997).

[39]See Estate of Smith v. Commissioner, 108 T.C. 412, 419-20 (1997); Estate of Kyle v. Commissioner, 94 T.C. 829, 849 (1990).

enforceability on the one hand and valuation on the other, has superficial appeal, closer examination reveals that it is not a sound basis for distinguishing claims in this context. There is only a semantic difference between a claim that may prove to be invalid and a valid claim that may prove to have a value of zero. For example, if given the choice between being the obligor of (1) a claim known to be worth $1 million with a 50 percent chance of being adjudged unenforceable, or (2) a claim known to be enforceable with a value equally likely to be $1 million or zero, a rational person would discern no difference in choosing between the claims, as both have an expected value $500,000.[40] Nevertheless, it could be argued that in some cases, the date-of-death claim against the estate is so specious that its value should be ignored because for practical purposes it is worthless. This is not such a case.

Here, the district court adjudicating the Jarvis Christian litigation had held, prior to Decedent's death, that Exxon had a cause of action against the royalty owners. Thus, the Estate was not claiming a deduction for a potential claim without an existing claimant — or, conversely, an identifiable claimant without a cognizable claim.[41] The actual value of Exxon's claim prior to

---

[40]Cf. Covey v. Commercial Nat. Bank of Peoria, 960 F.2d 657, 660 (7th Cir. 1992) ("Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law . . .").

[41]Our prior decision in Estate of Hagmaann v. Commissioner, 60 R.C. 465 (1973), aff'd per curiam, 492 F.2d 796 (5th Cir. 1974), can be distinguished on this basis.

either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim."[42]

In fact, when addressing situations that are the obverse of the one in the instant case, i.e., when the decedent-estate taxpayer is a plaintiff rather than a defendant in a pending lawsuit, the Commissioner has considered himself capable of determining the value of a pending lawsuit in exact dollars and cents, even when the claim has not been reduced to judgment.[43] Furthermore, courts have consistently held that "inexactitude is often a byproduct in estimating <u>claims or assets</u> without an established market and provides no excuse for failing to value the claims . . . in the light of the vicissitudes attending their recovery."[44]

In light of the foregoing analysis, we hold that the Tax Court erred reversibly when it determined that the amount that the Estate ultimately paid Exxon ($681,840) in a settlement achieved fifteen months after Decedent's death set the value of the Estate's § 2053(a)(3) deduction. On remand, the Tax Court is instructed neither to admit nor consider evidence of post-death occurrences

---

[42]<u>Gowetz v. Commissioner</u>, 320 F.2d 874, 876 (1st Cir. 1976).

[43]<u>See</u> <u>Estate of Davis v. Commissioner</u>, T.C. Memo. 1993-155, 65 T.C.M. (CCH) 2365.

[44]<u>Estate of Curry v. Commissioner</u>, 74 T.C. 540, 551 (1980)(emphasis added).

when determining the date-of-death value of Exxon's claim. As the Commissioner has recognized in the context of valuing closely-held businesses,

> [a] determination of fair market value, being a question of fact, will depend upon the circumstances in each case. No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. . . . A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.[45]

We find these words instructive to this case because, like a closely-held business, every lawsuit is unique; thus it is incumbent on each party to supply the Tax Court with relevant evidence of pre-death facts and occurrences supporting the value of the Exxon claim advocated by that party.

C.    Post-Death Income Tax Relief as an Estate Asset

We turn next to the question whether the income tax relief eventually afforded to the Estate for the sum paid in settlement to Exxon should be (1) listed on the Form 706 as an asset of the Estate, or (2) just one of any number of factors to be considered in valuing Exxon's claim for purposes of the § 2053(a)(3) deduction. Section 1341 of the Code allows an income tax deduction to a taxpayer who previously received taxable income under a claim of right, but who must later repay some or all of that income. For cash method taxpayers, the deduction is taken when computing the

---

[45]Rev. Rul. 59-60, 1959-1 C.B. 237.

**22**

income tax liability for the year of the repayment.[46] The parties stipulated that, as a payer of income tax, the Estate "is entitled to claim an additional income tax deduction for certain amounts paid to Exxon in 1992 in settlement of the Exxon claim pursuant to §§ 1341(a)(1) through (5)."

According to § 2031, "[t]he value of the gross estate [includes] the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Section 2033 provides further that "the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."[47] Neither the parties nor the Tax Court has referred us to any case law addressing whether the potential or inchoate right to future income tax relief under § 1341 is, pursuant to the I.R.C. and the Regs, an asset of the estate —— and we have found none on our own.

The Estate contends that the date-of-death potentiality of § 1341 income tax relief is not an asset of Decedent's gross estate. It reasons that, as a cash method taxpayer, an estate is not allowed a deduction under § 1341 unless and until it actually pays a claim that exists at death. Here, the Exxon claim was involved in hotly-contested litigation at the time Decedent died; there was no guarantee that anything would ever be paid on the claim; and in fact the repayment did not occur until fifteen months after her

---

[46]See § 1341(a).

[47]Regulations under § 2033 provide illustrative examples, none of which are on point. See Reg. 20.2033-1(b).

death.  The critical time for ascertaining both the existence and value of assets includable in the gross estate is "at the time of [the taxpayer's] death."[48]  The Estate thus concludes that the § 1341 income tax deduction, which was eventually allowed in 1992, did not exist as of death and, accordingly, cannot be included retroactively as an asset of her gross estate.

The Commissioner disagrees, insisting that the contingent right to income tax relief is an asset of the Estate.  For support, he cites cases holding that the value of a viable but unasserted income-tax-<u>refund</u> claim held by a decedent's estate for tax years predating death is a gross estate asset.[49]  The Commissioner <u>does not</u> argue that the presence of a contingency — i.e., the possibility, extant on the date of Decedent's death, that one of her defenses to Exxon's claim would succeed — is irrelevant.[50]  Rather, according to the Commissioner, the contingent nature of the § 1341 benefit should affect its valuation but not its existence or its characterization as an asset of the Estate.

The Commissioner acknowledges that, as cash method taxpayers,

_____

[48]<u>See</u> §§ 2031, 2033

[49]<u>See</u> <u>Bank of California v. Commissioner</u>, 133 F.2d 428, 432-33 (9th Cir. 1943) ("We conclude that the Board [of Tax Appeals] should have found the fair market value of decedent's [income tax refund] claim at the time of her death and should have included that value in determining the value of her gross estate."); <u>Estate of Chisholm v. Commissioner</u>, 26 T.C. 253, 257 (1956) (The refund claim resulting from an income tax overpayment "was valuable property and a part of his estate at the time he died.").

[50]If Decedent or the Estate were successful in defending against Exxon's claim then there would be no repayment and, therefore, no deduction under § 1341.

neither the Decedent nor the Estate would ever be entitled to income tax relief unless Exxon were repaid, and then only in the year of repayment. He contends, however, that there is no such predicate for including the right to future income tax relief as an asset when computing estate taxes.[51] Finally, the Commissioner urges that the Estate's position on this issue is at odds with its position regarding the propriety of deducting Exxon's claim under § 2053(a)(3). In the Commissioner's words, "the deduction for Exxon's claim and the offsetting tax relief obtained under § 1341 were interdependent tax consequences resulting from the settlement of a single claim against the decedents estate."

The Tax Court agreed with the Commissioner. It held that the right to income tax relief under § 1341 had some value at the time of Decedent's death. That the right was subject to a contingency, the court reasoned, may diminish its date-of-death value, but should not prevent it from being included as an asset of Decedent's gross estate.

We agree with the Commissioner and the Tax Court that the contingent right to future income tax relief under § 1341, based on pre-death events, is a factor that must be taken into account in connection with the Estate and that the contingent nature of the benefit merely affects its date-of-death value. We disagree, however, with the way that they would take the § 1341 benefit into

---

[51]See, e.g., Bank of California v. Commissioner, 133 F.2d 428, 432 (9th Cir. 1943) (holding that a claim for an income tax refund that had not been asserted at death was a property right to be included in determining the value of the gross estate); United States v. Simmons, 346 F.2d 213 (5th Cir. 1965).

account on the Form 706.  If required to repay some amount to Exxon, the Estate would be entitled automatically to a corresponding income tax deduction (or refund) in the year of the repayment.[52]  Once Exxon's claim against the Estate was liquidated, the value of the § 1341 income tax relief (if any) could be computed to the penny.

We have already held today that Exxon's claim can be valued with sufficient certainty to entitle the Estate to a <u>deduction</u> under § 2053(a)(3), and that the appropriate inquiry is to the claim's value as of the date of Decedent's death.  It would be incongruous for us to hold on the one hand —— as we have —— that the Estate can take a deduction for Exxon's claim based on an appraisal of its date-of-death value, while holding on the other hand (as the Commissioner urges) that the inextricably intertwined income tax benefit that will flow to the Estate only when and if it pays this amount should be treated separately, as an asset, or —— even worse —— totally ignored (as the Estate urges).

The Commissioner calls the benefit under § 1341 and the deduction under § 2053 "interdependent," and the Tax Court accepted this characterization.  On this much, we agree, but our agreement leads inexorably to the conclusion that the value, for estate tax purposes, of the contingent § 1341 deduction is not a separate, free-standing asset of the Estate but is one among any number of

---

[52]Section 1341 is inapplicable if it does not afford at least a $3,000 deduction.  <u>See</u> § 1341(a)(3).  The only way the estate would be unable to claim a § 1341 deduction would be if the repayment did not surmount this <u>de minimus</u> threshold.

factors to be considered in appraising the date-of-death value eventually assigned to Exxon's claim for purposes of the deduction allowed under § 2053(a)(3): Both the § 2053(a)(3) estate tax deduction and the eventual § 1341 income tax benefit hinge on the likelihood and quantum of the same event — a judgment (or compromise) in favor of Exxon.[53] Of course, once the Tax Court determines, on remand, the gross value of the Exxon claim for purposes of § 2053(a)(3), calculation of the § 1341 income tax benefit becomes a simple mathematical calculation, the result of which will diminish the gross value of the Exxon claim, dollar for dollar, to produce a net deduction from the Estate. That in hindsight either figure might prove to have missed the mark, whether widely or narrowly, is of no moment; after all, property of an estate frequently sells for a price that is greater or less than the appraised value used in the Form 706.

The willing buyer-willing seller standard of valuation prescribed by Treasury Regulations promulgated under § 2031[54] is "nearly as old as the federal income, estate, and gift taxes

---

[53]The Tax Court did, in fact, use the same "estimate" of value to compute both the estate tax deduction and the concomitant income tax deduction cum gross estate asset — the post-death settlement. But, as we reject the value assigned to Exxon's claim for purposes of the § 2053(a)(3) deduction, so too must we reject the automatic use of the settlement value as the basis for calculating the value of the contingent § 1341 income tax relief. See §§ 2031, 2033 (gross estate assets are valued as of "the time of [the taxpayer's] death.").

[54]"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." Reg. § 20.2031-1(b).

themselves."[55]  We perceive no reason why this standard should presume that the participants in the hypothetical transaction would not account for the net tax effect —— including the § 1341 benefit —— that would flow from a judgment against the hypothetical estate.

This view is consistent with the gift tax decision of the Second Circuit in Eisenberg v. Commissioner,[56] which held that when valuing a gift of corporate stock, the potential future capital gains tax liability that would result from a corporate liquidation can be considered.[57]  In the instant case, the tax event that was looming on the horizon at the date of death is the converse of the one in Eisenberg: Rather than a potential future tax detriment, as was the case in Eisenberg, here there was a potential future tax benefit to the Estate, which would ripen in the event that it were to repay to Exxon, in whole or in part.  Nevertheless, the reasoning of the Eisenberg court is equally applicable:

> Fair market value is based on a hypothetical transaction between an willing buyer and a willing seller, and in applying this willing buyer-willing seller rule, "the potential transaction is to be analyzed from the viewpoint of a hypothetical buyer whose only goal is to maximize his advantage.  Courts may not permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical buyer."[58]

Treasury Regulations dictate, and countless authorities reaffirm,

---

[55]United States v. Cartwright, 411 U.S. 546, 551 (1973).

[56]155 F.3d 50 (1998).

[57]See id.

[58]Id. at 57 (quoting Estate of Curry v. United States, 706 F.2d 1424, 1428 (7th Cir. 1983) (citations and alterations omitted)).

that "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case."[59]

We perceive no reason to believe that a seller seeking to make the best possible trade would ignore the income tax benefit associated with a set of transactions; to the contrary, we agree with the Second Circuit that "a hypothetical willing [seller], having reasonable knowledge of the relevant facts, would take some account of the tax consequences . . . in making a sound valuation of the property"[60] — here, the income tax benefit afforded to the Estate by § 1341.[61]

Thus, on remand, when appraising the net value of the deduction allowed the estate under § 2053(a)(3), account must be taken of the § 1341 income tax benefit that would have inured to the benefit of the Estate if it had ultimately been held liable (or settled) for a sum equal to the appraised date-of-death gross value of Exxon's claim.[62]

---

[59]Reg. § 20.2031-1(b).

[60]155 F.3d at 57.

[61]Obviously, the position of a <u>defendant</u> in a pending lawsuit is not a thing commonly bought or sold. There is certainly no ready market in which the Estate could pay another to assume its place as the subject of Exxon's claim. We have held, however, that the willing buyer-willing seller method applies to all questions of valuation, even when, as a realistic matter, the subject property might not be sold or assigned at all. <u>See</u> <u>United States v. Simmons</u>, 346 F.2d 213, 216 (5th Cir. 1965); <u>cf.</u> <u>United States v. Cartwright</u>, 41 U.S. 546, 549 (1973) (applying the willing buyer-willing seller valuation rule although "[p]rivate trading in mutual fund shares is virtually nonexistent.").

[62]We are aware, of course, that in holding that the § 1341 income tax benefit is not an estate asset but is a factor affecting the value of the § 2053(a)(3) estate tax deduction, we do not

D.    Discberge-of-Indebtedness Income

We next address the Commissioner's cross appeal, urging that the general rule that gross income includes income from the discharge of indebtedness has potential application in this case. More specifically, the Commissioner argues that if the Estate prevails on the § 2053(a)(3) deduction issue, i.e., if, despite having actually paid "only" $681,840 to settle Exxon's claim, the Estate is allowed to deduct $2.48 million, then pursuant to § 61(a)(12) the Estate will have had income from the discharge of indebtedness equal to the difference between the settlement payment and the deduction (approximately $1.8 million).

The Commissioner styles his cross-appeal as "protective" because it relates to an assessment that will remain inchoate unless the Estate is eventually permitted to assign a value to the deduction that is greater than the actual settlement payment of $681,840.  The Commissioner acknowledges that a deduction equal to or less than $681,840 would not, under his theory, result in debt discharge income.  As the Tax Court held that the § 2053(a)(3) estate tax deduction was limited to the settlement payment of $681,840, the court did not address this issue.  If on remand the value of the § 2053(a)(3) deduction determined by the Tax Court exceeds $681,840, the discharge-of-indebtedness income issue will require resolution.  For reasons of judicial economy, we resolve it

change the "bottom line" of the Form 706.  But that is not our concern; our effort today is aimed at getting the tax treatment "right," regardless of the revenue result.

now.[63]

The discharge-of-indebtedness doctrine applies when a taxpayer who has incurred a financial obligation is thereafter relieved of liability, in whole or in part. When that happens, the taxpayer recognizes taxable income equal to the difference between the initial obligation and the amount, if any, paid to discharge that obligation.[64] A necessary prerequisite to applying the doctrine, then, is that the taxpayer shall have incurred a financial obligation.

If, in this case — as the Estate urges — Exxon possessed "enforceable contractual rights" against the Estate for a fixed sum, the doctrine would have potential application because the Estate would have incurred a financial obligation. But, we have already rejected the Estate's assertion that Exxon's claim could be so characterized. Rather, this case involves an unliquidated claim for contribution or restitution, the actual value of which was not ascertained until the case settled. To be sure, the Estate was better off paying Exxon $681,840 in settlement than it would have been had it capitulated while Exxon was claiming more than four times that sum. For this benefit to constitute income from the discharge of indebtedness, however, there must first have been an

---

[63]See Lunsford v. Price, 885 F.2d 236, 239 & n.12 (5th Cir. 1989); see also United States v. Marine Shale Processors, 81 F.3d 1361, 1369 n.8 (5th Cir. 1996); United States v. Carreon, 11 F.3d 1225, 1232 n.18 (5th Cir. 1994); Jones v. Diamond, 594 F.2d 997, 1026 (5th Cir. 1979).

[64]See § 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931); Preslar v. Commissioner, 167 F.3d 1323, 1327 (10th Cir. 1999); Zarin v. Commissioner, 916 F.2d 110 (3d Cir. 1990).

indebtedness within the meaning of § 61(a)(12). Here there was not.

Restating the point first articulated by Professors Bittker and Thompson,[65] the Supreme Court, in <u>United States v. Centennial Savings Bank FSB</u> explained as follows:

> Borrowed funds are excluded from income in the first instance because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets; if the taxpayer is thereafter released from his obligation to repay, the taxpayer enjoys a net increase in assets equal to the forgiven portion of the debt and the basis for the original exclusion thus evaporates.[66]

Thus analyzed, the reason why the discharge-of-indebtedness concept has no application to these facts becomes clear: There were no borrowed funds that were excluded from taxable income in the first place.[67] Rather, Decedent had paid income tax on Exxon's royalty payments when she received them. There could be no release from an obligation to repay — that is, no "discharge" — because, until the parties settled the case, no such obligation actually existed.

Our conclusion that there can be no discharge-of-indebtedness income is supported by the so-called "contested liability"

---

[65]<u>See</u> Boris I. Bittker & Barton H. Thompson, Jr., <u>Income from the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co.</u>, 66 Calif. L. Rev. 1159 (1978).

[66]499 U.S. 573, 581 (1991).

[67]We are not suggesting that the indebtedness must necessarily arise from a loan. It is possible, for example, that had Exxon's claim been reduced to a final judgment, the judgment would constitute an indebtedness. In any event, we are not faced with and express no opinion regarding that situation.

doctrine.[68]  This doctrine "rests on the premise that if a taxpayer disputes a debt in good faith, a subsequent settlement of the dispute is 'treated as the amount of debt cognizable for tax purposes.'"[69]  Recently the Tenth Circuit found the doctrine inapplicable in Preslar v. Commissioner.[70]  The Preslar court criticized the Third Circuit's reliance on the contested liability doctrine in Zarin v. Commissioner.[71]  In Zarin, the taxpayer had received casino chips purportedly worth $3.4 million.  The casino had, however, violated New Jersey gaming regulations by extending credit to Zarin.  Thus when the casino made a claim against Zarin to recoup the debt, it was less than certain to succeed.  Relying on N. Sobel, Inc. v. Commissioner,[72] the Zarin court concluded that when Zarin paid the casino $500,000 to settle the matter, the settlement served to "fix the amount of the debt."[73]

Preslar criticized Zarin for not recognizing the difference that the Preslar court perceived between disputes about the amount of the debt on the one hand and the enforceability of a claim for a sum certain on the other.  As the Preslar court more fully

---

[68]Alternatively called the "disputed debt" doctrine.  See 1 B. Bittker and L. Lokken, Federal Taxation of Income Estates and Gifts, ¶ 7.2.5 (3d ed. 1999).

[69]Preslar v. Commissioner, 167 F.3d 1323, 1327 (2d Cir. 1999) (quoting Zarin v. Commissioner, 916 F.2d 110, 115 (3d Cir. 1990)).

[70]167 F.3d at 1327.

[71]916 F.2d 110 (3d Cir. 1990).

[72]40 B.T.A. 1263, 1939 WL 101 (1939).

[73]916 F.2d at 115.

explained,

> [t]he mere fact that a taxpayer challenges the enforceability of a debt in good faith does not necessarily mean he or she is shielded from discharge of indebtedness income upon resolution of the dispute. To implicate the contested liability doctrine, the original amount of the debt must be unliquidated. A total denial of liability is not a dispute touching upon the amount of the underlying debt.[74]

We need not choose today between the broad view of the contested liability doctrine accepted by the Third Circuit in Zarin and the more narrow view taken by the Tenth Circuit in Preslar. For here, both the amount and the enforceability of the debt were contested vigorously by the Estate; it was not until settlement that Exxon's claim became liquidated. Thus, even if we assume arquendo that the view of the Preslar court is the correct one, the contested liability doctrine applies here and buttresses our conclusion that the Estate did not realize income from the discharge of indebtedness.

We are aware that our analysis of this issue has employed a different temporal perspective than did our analysis of the issue regarding when to value Exxon's claim for purposes of the § 2053(a)(3) deduction allowed for claims against the estate. This apparent inconsistency is explained by the fact that § 2053(a)(3) is an estate tax provision whereas the discharge-of-indebtedness doctrine is an income tax concept. Unlike the estate tax which, by its nature, is imposed only once (if at all), income tax is imposed on an annual basis. And, for cash method income-taxpayers like the

---

[74]167 F.3d at 1328.

Decedent and the Estate, income is reported only when it is received.

E.    Motion to Amend

The final issue presented by this appeal is whether the Tax Court abused its discretion when it denied the Estate's motion to amend its petition.[75] As noted, after the parties had submitted the case to the Tax Court for decision, the Estate sought to amend its petition. Through the amendment, the Estate sought to assert that the Commissioner was collaterally estopped from contesting the validity of Exxon's claim against the estate. Specifically, the Estate's proffered amendment alleged that, in the Exxon litigation, the government had "obtained an actual determination that overcharges had been paid to interest owners in the HFU as a result of sale of oil in violation of the federal pricing regulations," and that this determination had established liability on the part of the royalty owners.

We have held that when exercising its discretion, the Tax Court must consider "such factors as the timeliness of the motion, the reasons for delay, whether granting the motion would result in issues being presented in a seriatim fashion, and whether the party opposing the motion would be unduly prejudiced."[76] We cannot say that the Tax Court abused its discretion in applying these factors

---

[75]Denial of motion to amend Tax Court petition reviewed for abuse of discretion. See Durrett v. Commissioner, 71 F.3d 515, 518 (5th Cir. 1996).

[76]Id. at 518 (citing Daves v. Payless Cashways, Inc., 661 F.2d 1022 (5th Cir. 1981)).

to the instant case.  The only explanation offered by the Estate for its tardiness is that it did not realize until after the case had been submitted that it should have raised the issue of collateral estoppel.  The Estate had ample time and opportunity to discover and raise the issue before submitting the case for decision; simple inadvertence falls short of a legally adequate explanation for the Estate's delay.  Accordingly, we hold that the Tax Court did not abuse its discretion in denying the Estate's motion to amend.

III

CONCLUSION

For the foregoing reasons, the rulings of the Tax Court are reversed, the judgment vacated, and this case is remanded, with instructions, for further proceedings consistent with this opinion. REVERSED, VACATED, and REMANDED.