Elizabeth Paramore O'NEAL, Estate of, deceased, Elizabeth O'Neal Shannon, Personal Representative, Emmet O'Neal, II, Personal Representative, Emmet O'Neal, III, Personal Representative, Plaintiffs, Counter-defendants, Appellants,

v.

UNITED STATES of America, Defendant, Counter-claimant, Appellee.

No. 00-11663.

United States Court of Appeals,

Eleventh Circuit.

July 26, 2001.

Appeals from the United States District Court for the Northern District of Alabama. (No. 97-02189-CV-J-S), Inge P. Johnson, Judge.

Before BLACK, RONEY and HILL, Circuit Judges.

HILL, Circuit Judge:

This estate tax claim for refund case presents an issue of first impression in this circuit.[1] It also spotlights the distinct split among the circuits on this issue. Based upon our reading of *Ithaca Trust Co. v. United States,* 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), we conclude that the value of the deduction claimed by the estate as a claim against the estate under Section 2053(a)(3) of the Internal Revenue Code must be valued as of the date of the decedent's death. 26 U.S.C. § 2053(a)(3). Events occurring after the decedent's death that alter the value must be disregarded.[2] *Ithaca Trust,* 49 S.Ct. at 291.

### I. FACTUAL BACKGROUND

*A.*    *Reimbursement for Transferee Gift Tax Liability as a Claim Against the Estate Deduction under Section 2053(a)(3)*

"In consequence of life's two certainties," the facts are undisputed. *Commissioner v. Estate of Hubert,* 520 U.S. 93, 117 S.Ct. 1124, 1127, 137 L.Ed.2d 235 (1997). They involve the complicated interplay between transferee gift taxes paid by the recipients of a gift and an estate tax deduction for their reimbursement by the estate of the decedent donor. A proper valuation of the transferee gift tax has a direct impact upon the amount of estate taxes ultimately owed by the estate.

Elizabeth Paramore O'Neal and her husband were minority shareholders in O'Neal Steel, Inc., a

---

[1] *See* note 24 *infra.*

[2] Other remaining tax issues are discussed in detail below.

closely-held family corporation located in Alabama.[3] Together they had two children, Emmet and Elizabeth (the children donees), and seven grandchildren (the grandchildren donees) (collectively the nine heirs).

In 1987, the O'Neals gifted all their stock to the nine heirs.[4] On the day of the gift, the nine heirs entered into a consent and supplemental stock purchase agreement, in which each of them agreed to contribute on a pro rata basis toward the payment of transferee (or donee) gift tax liability, if any. Emmet held the shares in escrow until the agreement was signed by all. Approximately nine months after the gifts were made, Mr. O'Neal died.

Mrs. O'Neal's gift tax returns were timely filed. She paid $810,000 in gift taxes.[5] This amount was calculated based upon the stock values set forth in a 1951 company buy-sell agreement, as amended in 1976. The buy-sell agreement created an option in other members of the O'Neal family to buy stock in the family company at set prices. Class A non-voting stock was valued at $54.00 per share. Class B voting stock was valued at $61.00 per share. The O'Neals did not have sufficient share ownership to change the option prices, as this required the consent of 75% of the shareholders.

The government did not begin an audit of either Mr. or Mrs. O'Neal's gift tax returns until July 1990, nine months prior to the expiration of the three-year statute of limitations for assessing gift tax liability against them personally. During the audit, the agent requested much information. Much was supplied, well in advance of the statutory deadline.[6] At no point prior to the deadline did the government assert that either Mr. or Mrs. O'Neal had failed to pay the appropriate amount of gift tax owing with respect to the 1987 gifts. Neither did the government request an extension of time in order to assess any additional gift tax due. When the statute of limitations expired, the government was barred from collecting any additional gift tax from

<hr />

[3]Mr. O'Neal owned 24.6% of Class A non-voting stock and 15.7% of Class B voting stock. Mrs. O'Neal owned 21.2% of Class A non-voting stock and 17% of Class B voting stock.

[4]Mrs. O'Neal gave the children donees 19 shares of Class B voting stock each. Emmet's three children, as grandchildren donees, received 6,058 shares of Class A nonvoting stock. Elizabeth's four children, as grandchildren donees, received 4,544 shares of Class A nonvoting stock. Mr. O'Neal made similar gifts to the nine heirs that are not at issue in this case.

[5]Mr. O'Neal's gift tax returns were also timely filed. He paid $820,665 in gift taxes. After his death, the dispute arising from the 1987 gifts has been administered by the personal representatives of his estate.

[6]Mr. O'Neal's personal representatives supplied copies of gift tax returns; the 1951 buy-sell agreement, as amended; stock ownership records of O'Neal Steel, Inc.; details of any dispositions of company stock; descriptions of company business; copies of corporate tax returns; and miscellaneous detailed information regarding the payment of the O'Neal's 1987 gift taxes.

either Mr. O'Neal's estate or Mrs. O'Neal.

Nevertheless, the audit continued. In September 1991, the examining agent requested that an expert valuation study be performed on the 1987 value of the Class A and Class B stocks. Two months later, the nine heirs were advised that the government intended to assert transferee gift tax liability against them based upon its pending revaluation of the family company stock. Two months after that, the government valuation report issued. The government appraiser stated in his report that, in his opinion, on the date of the gifts, the value of the Class A nonvoting stock was $375.00 per share, and the value of the Class B voting stock was $415.00 per share, a seven-fold increase in each class.

Two days before the statute of limitations to assert transferee gift tax liability against the nine heirs was to expire, the government issued statutory notices of deficiency asserting that Mrs. O'Neal owed an additional $9,407,226 in gift taxes on the 1987 gifts, for which the nine heirs were liable. Similar notices were issued on Mr. O'Neal's gifts.[7] At this point, Mrs. O'Neal was still living.

The grandchildren donees made partial transferee gift tax payments totaling $4,244,994. They then filed for a redetermination of transferee gift tax liability in tax court, contesting the government revaluation of stock and the government's right to assert transferee gift tax liability against them. In April 1994, the tax court found the grandchildren donees liable, although it did not determine the dollar amount of liability at that time.[8]

The children donees made partial transferee gift tax payments totaling $15,770. Instead of filing in tax court, the children donees first filed claims for refund with the government that were quickly disallowed thirteen days later. Thereafter, they filed claim for refund actions in Alabama federal district court, with assertions similar to those made by the grandchildren donees in tax court.[9]

Mrs. O'Neal died in July 1994. Her estate tax return was timely filed in April 1995. It reflected a negative taxable estate and no estate tax due.[10] The negative taxable estate resulted from the Section

---

[7]The nine heirs filed contingent claims in probate court against Mr. O'Neal's estate seeking reimbursement for any transferee gift taxes for which they might finally be liable on Mr. O'Neal's 1987 gifts.

[8]See O'Neal v. Commissioner, 102 T.C. 666 (1994)(the grandchildren donees' consolidated cases).

[9]The children donees' district court cases were stayed pending the resolution of the grandchildren donees' tax court cases.

[10]The total gross estate was $5,274,798 and the negative taxable estate was ($4,263,450).

2053(a)(3) deduction of $9,407,226 taken on Schedule K for "claims for reimbursement of transfer gift tax liability by donees of 1987 gifts."  The amount of the deduction claimed by the estate was calculated using the government's per share stock values.[11]

Shortly after it was filed, Mrs. O'Neal's estate tax return was selected for audit.  The most notable challenge by the government was to the amount of the Schedule K deduction.

In April 1995, more than nine months after Mrs. O'Neal's death and more than a year after the action had been filed, the grandchildren donees and the government settled their tax court litigation.  Pursuant to the terms of the settlement, the parties agreed that the Class A stock was to be finally valued at $77 per share (instead of $375) and that the Class B stock was to be finally valued at $82 per share (instead of $415).[12]

A joint stipulation was submitted to the tax court.  Both sides agreed that the grandchildren donees had a total transferee gift tax liability of $487,814, plus interest.  The tax court then entered final decisions in the seven consolidated grandchildren donee cases.  The district court followed suit in the pending children donee cases.  Thereafter, the probate court entered an order holding that the claims of the nine heirs were now valid and enforceable, and the nine heirs received $563,314 in reimbursement monies from the estate.

The estate then filed an amended estate tax return reducing the Section 2053(a)(3) deduction for claims against the estate on Schedule K from $9,407,226 to $563,314.  This changed the amount of estate tax due dramatically.  Once a negative figure, Mrs. O'Neal's taxable estate swelled to $4,302,539, generating $1,883,762 in estate taxes that were paid by the estate with the amended return.  The estate then filed a claim for refund action in district court on the Section 2053(a)(3) issue.[13]  The government asserted three counterclaims pertinent to this appeal.[14]  *See* Parts I.B—I.D. *infra.*

---

[11]As they had done in Mr. O'Neal's estate, the nine heirs filed contingent claims in probate court against Mrs. O'Neal's estate seeking reimbursement for any transferee gift taxes for which they might finally be liable on her 1987 gifts.  As certain of the nine heirs served as personal representatives of Mrs. O'Neal's estate, an administrator ad litem was appointed to approve and contest their disputed claims.  After hearing, due to the pendency of the tax court litigation, the probate court dismissed without prejudice the nine heirs' claims as premature.

[12]The Class A and Class B settlement values were decidedly closer to those values set forth in the buy-sell agreement of $54 and $61, respectively.

[13]Concomitantly, Mr. O'Neal's estate filed a separate refund suit in district court.  Those proceedings have been stayed pending resolution of this action.

[14]The three counterclaims involved attorneys' fees paid both before and after Mrs. O'Neal's death, and the calculation of the interest expense deduction for her estate.

B.      *Attorneys' Fees Paid Prior to Death by Holder of Power of Attorney as an Asset of the Estate under Section 2031(a)*

Mrs. O'Neal's son Emmet, acting as attorney-in-fact for his mother during her life, paid $114,022 to the Chamberlain, Hrdlicka law firm.  This payment was made with Mrs. O'Neal's funds.  Count One of the government's counterclaim asserts that Emmet did not have the authority to use his mother's assets and that these fees benefitted certain of her donees and not Mrs. O'Neal.  As a result the government contends that Mrs. O'Neal's estate possesses a claim against Emmet to recover these unauthorized transfers, and that her gross estate should be increased by the same amount.

In support of its motion for summary judgment, the government submitted Mrs. O'Neal's four-page durable power of attorney to the district court.  Its authorization powers are very broad.[15]  However the power expressly prohibits the use of Mrs. O'Neal's property to pay other debts.[16]  The estate contends that the language contained in the power itself proves that Emmet possessed the authority to act on his mother's behalf.

During discovery, the government asked that the estate produce copies of legal fee invoices.  The estate declined on the basis of attorney-client privilege.

In strictly construing the power, the district court found that, without a proper accounting, there was insufficient evidence to prove that the monies were used to pay Mrs. O'Neal's debts and not those of her son Emmet.

C.      *Attorneys' Fees Paid after Death as an Administrative Expense Deduction under Section 2053(a)(2)*

Count Three of the government's counterclaim contends that $74,485 in attorneys' fees paid to the Chamberlain, Hrdlicka law firm after Mrs. O'Neal's death were not incurred for the benefit of the estate and therefore were not properly deductible as administrative expenses under Section 2053(a)(2).  In response, the estate submitted two affidavits of a Chamberlain, Hrdlicka law partner explaining what the firm accomplished in protecting Mrs. O'Neal's interest.

During discovery, the government again requested that the estate produce copies of legal fee invoices.

---

[15]" ... [To] do and perform each and every act, deed, matter and thing whatsoever in and about my estate, property and affairs as fully and effectually to all intents and purposes as I might or could do in my own proper person, if personally present...."

[16]"Notwithstanding any provision herein to the contrary, Agent shall not satisfy any legal obligation of Agent out of any property subject to this Power of Attorney, nor may Agent exercise this power in favor of Agent, Agent's estate, Agents' creditors or the creditors of Agent's estate."

On the basis of privilege, the estate again declined.

The district court found that the estate had failed to substantiate the deduction for attorneys' fees as, without itemized fee statements, it was unable to determine the reasonableness or propriety of the amount claimed. It found the affidavits insufficient and chided the estate for not availing itself of the opportunity to produce the invoices *in camera.*

D.       *Interest Expense Deduction under Section 2053(a)(2)*

Count Four of the government's counterclaim asserted that the estate should not be allowed an administrative expense deduction of $221,473 for interest paid on federal estate and state death tax liabilities until (1) there was a final determination of liability and (2) the estate agreed that it would not claim such interest as an income tax deduction. In an amended order, the district court found the interest deduction claimed by the estate ascertainable with reasonable certainty. Based upon an arbitrary date, it calculated interest to be $307,750.

On appeal, the government now appears to concede the second parameter of its counterclaim. In addition, it will agree to a limited remand to the district court at the conclusion of litigation in order to finally determine the amount of interest accrued on any unpaid estate tax liability. The estate is in agreement.

## II. PROCEDURAL BACKGROUND

As stated, the estate filed a claim for refund with the government for $1,883,762 in estate taxes, on the basis that it was entitled to the $9,407,226 deduction with respect to nine heirs' claims against the estate under Section 2053(a)(3). When the government failed to respond to the estate's refund claim after the statutory waiting period of six months,[17] the estate filed this action in district court. The central issue was whether or not the estate should be entitled to such a large deduction. In its amended answer, the government claimed that the deduction should be zero. In addition, it asserted its three counterclaims.

Following a hearing on the parties' cross-motions for summary judgment, the district court: (1) found in favor of the estate on the merits of the central issue, but reduced the value of the deduction from $9,407,226 to $563,314, the amount of the reimbursement, based upon the per share stock values determined in the grandchildren donees' tax court settlement and allowed by the probate court; (2) found in favor of the government as to the $114,022 in attorneys' fees paid prior to Mrs. O'Neal's death, and increased the amount of the gross estate accordingly; (3) found in favor of the government as to the $74,485 in attorneys' fees paid

---

[17]The government's response came after fourteen months had passed.

after Mrs. O'Neal's death;  and, (4) by amended order, following a second hearing, determined the interest expense deduction to be $307,750.  The estate now appeals from these two orders.

## II I.  STANDARD OF REVIEW

We review the district court's grants of partial summary judgment and summary judgment *de novo,* reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party, and applying the same standard as the district court.  *Wesson v. Huntsman Corp.,* 206 F.3d 1150, 1152 (11th Cir.2000) (citations omitted).  A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "If the record presents factual issues, the court must not decide them;  it must deny the motion and proceed to trial."  *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1369 (11th Cir.1982).  A grant of summary judgment may be upheld on any basis supported by the record.  *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1118 (11th Cir.1993).

## IV. DISCUSSION

*A.        Section 2053(a)(3)—Claims Against the Estate*

*1.        In General*

Federal estate tax is imposed upon the taxable estate of a United States citizen or resident alien dying in the United States.  26 U.S.C. § 2001.  The taxable estate is defined as the value of the gross estate minus deductions allowable by statute.  26 U.S.C. § 2051.  For purposes of this appeal, the relevant deductions are found in subsection (a)(3) of Section 2053 for "claims against the estate."  26 U.S.C. § 2053(a)(3).  The statute is silent regarding the date for valuing claims against the estate.[18]  In general, the amounts that may

---

[18]Section 2053(a) reads in its entirety as follows:

> General rule.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—
>
> (1) for funeral expenses,
>
> (2) for administration expenses,
>
> (3) for claims against the estate, and
>
> (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdiction,

be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his or her death, whether or not then matured. Treas. Reg. § 20.2053-4.[19] However, the regulations go on to state that a deduction will be allowed for a claim against the estate even "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid." Treas. Reg. § 20.2053-1(b)(3).

2.      *Contentions of the Parties*

Here there is no dispute that the estate is entitled to a deduction with respect to claims against the estate by the nine heirs for reimbursement of their transferee gift tax liability on the 1987 gifts of stock by Mrs. O'Neal.[20]  As to the amount of the deduction, the estate argues that we must ignore the tax court settlement made by the grandchildren donees nine months after Mrs. O'Neal's death and instead use the $9,407,226 demand amount asserted by the government in its own statutory notices of deficiency. The government contends that the tax court settlement figure of $563,314, as found by the district court and approved by the probate court, is the proper amount of the deduction as it represents the actual amount of taxes ultimately paid.

3.      *The Split Among the Circuits*

How do we value this deduction for a claim against the estate?  Do we take a valuation snapshot on the day Mrs. O'Neal died?  Or, do we consider events occurring after her death, such as the tax court settlement between the grandchildren donees and the government?  These questions reflect the dilemma where a valid, enforceable claim may exist at the time of the decedent's death, but subsequent events may relieve the estate of all or a portion of its liability for the claim.[21]  In this context, two distinct and

whether within or without the United States, under which the estate is being administered.

26 U.S.C. § 2053(a).

[19]Taxes are deductible in computing a decedent's gross estate only as claims against the estate. Treas. Reg. § 20.2053-6(a).  Unpaid gift taxes on gifts made by a decedent before his death are deductible. Treas. Reg. § 20.2053-6(d).

[20]In June 2000, the government moved for and was granted a voluntary dismissal of its notice of appeal on the issue that Mrs. O'Neal's estate was not entitled to the $563,314 deduction.  By this action the government appears to have abandoned its earlier argument that the amount of the deduction should be zero.

[21]Conversely, the same dilemma exists where subsequent events may enlarge the estate's liability for a claim.  *See also* note 28 *infra.*

irreconcilable lines of cases have been spawned.

There are those circuits that strictly follow the 1929 Supreme Court decision in *Ithaca Trust Co. v. United States,* 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), and its general rule that post-death events must not be considered in valuing the amount of the deduction, as "[t]he estate so far as may be is settled as of the date of the testator's death."[22] And, there are those that follow the 1929 Eighth Circuit decision in *Jacobs v. Commissioner,* 34 F.2d 233 (8th Cir.1929), *cert. denied,* 280 U.S. 603, 50 S.Ct. 85, 74 L.Ed. 647 (1929), and its approach that post-death events must be considered, as "[t]he claims which Congress intended to be deducted were actual claims, not theoretical ones."[23]

We prefer to follow the analysis used by the Supreme Court in *Ithaca Trust,* 49 S.Ct. at 291.[24] In *Ithaca Trust,* the decedent bequeathed property to charity and reserved a life estate in his spouse. The widow died six months after her husband died, but before his estate tax return was filed.

The question presented was whether the charitable deduction should be calculated using the actuarial

---

[22]*See Estate of McMorris v. Commissioner,* 243 F.3d 1254 (10th Cir.2001); *Estate of Smith v. Commissioner,* 198 F.3d 515, 521 (5th Cir.1999); *Estate of Van Horne v. Commissioner,* 720 F.2d 1114 (9th Cir.1983); *Propstra v. United States,* 680 F.2d 1248 (9th Cir.1982); *Greene v. United States,* 447 F.Supp. 885 (N.D.Ill.1978)(where the district court suggested that the matter is "obviously yearning for legislative clarification"); *Estate of Lester v. Commissioner,* 57 T.C. 503 (1972); *Russell v. United States,* 260 F.Supp. 493 (N.D.Ill.1966); *Winer v. United States,* 153 F.Supp. 941 (S.D.N.Y.1957).

[23]*Estate of Kyle v. Commissioner,* 94 T.C. 52, (1990); *Estate of Sachs v. Commissioner,* 856 F.2d 1158 (8th Cir.1988); *Commissioner v. Shively's Estate,* 276 F.2d 372 (2d Cir.1960); *Estate of Hagmann v. Commissioner,* 60 T.C. 465 (1973), *aff'd per curiam,* 492 F.2d 796 (5th Cir.1974); *Commissioner v. State Street Trust* Co., 128 F.2d 618 (1st Cir.1942); *see also Nesselrodt Est. v. Commissioner,* 51 T.C.M. (CCH) 1406 (1986).

[24]Decisions issued by the Fifth Circuit prior to October 1, 1981 are binding precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981)(en banc). In 1974, the Fifth Circuit, in *Estate of Hagmann v. Commissioner,* 60 T.C. 465 (1973), *aff'd per curiam,* 492 F.2d 796 (5th Cir.1974), affirmed the judgment of the tax court. The tax court opinion departed from *Ithaca Trust* and considered post-death events when it held that the estate was not entitled to a Section 2053(a)(3) deduction for debts that were obligations at the date of death, but never asserted by the claimants. In the absence of assertion, the obligations became unenforceable. The tax court limited its holding to the peculiar "circumstances of this case" involving "[a] claim without a claimant," but wrote in such a fashion that its opinion might be considered broader. 60 T.C. at 467. After considering the matter, our predecessor court, by memorandum opinion, stated that "we affirm the judgment of the Tax Court." 492 F.2d at 796.

Twenty-five years later, in *Estate of Smith v. Commissioner,* 198 F.3d 515, 525 (5th Cir.1999), the Fifth Circuit distinguished *Estate of Hagmann* on the basis that it was limited to a factual situation evaluating a potential claim without an existing claimant, or an identifiable claimant without a cognizable claim. We agree with this distinction. *Id.* We would also not be bound by a different reading of *Estate of Hagmann* as our per curiam opinion did not adopt the opinion of the tax court, but merely affirmed the judgment. *See DeShong v. Seaboard Coast Line R. Co.,* 737 F.2d 1520, 1523 (11th Cir.1984).

value of the widow's life expectancy at the date of her husband's death (a decrease in value), or calculated by using the actual and known date of her death (an increase in value). The Supreme Court concluded that the charitable deduction had to be valued based on the wife's probable life expectancy as of her husband's date of death rather than the known fact that she died only six months after her husband.

Cited many times, Justice Holmes, writing for a unanimous court, reasoned:

> The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death ... The tax is on the act of the testator not on the receipt of property by the legatees ... Therefore, the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market ... Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true ... Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables.

49 S.Ct. at 291-292.[25]

We therefore align ourselves with the more persuasive and better-reasoned opinions of those circuits that follow *Ithaca Trust.*[26] Our case is very similar to *Estate of Smith v. Commissioner,* 198 F.3d 515 (5th Cir.1999) and *Estate of McMorris v. Commissioner,* 243 F.3d 1254 (10th Cir.2001).

In the *Estate of Smith* case, Exxon Corporation sued Ms. Smith to recoup an alleged overpayment of oil and gas lease royalties. In November 1990, Ms. Smith died, while Exxon's motion for summary judgment was pending. Three months later the district court granted summary judgment for Exxon and referred the calculation of damages to a special master. Exxon claimed it was owed $2,482,719 by the estate. *Estate of Smith,* 198 F.3d at 519.

Ms. Smith's estate tax return was filed in July 1991, eight months after her death, five months after the summary judgment in Exxon's favor, yet before the final calculation of damages by the special master. Her estate tax return included a Section 2053(a)(3) deduction of $2,482,719 for Exxon's demand claim against the estate. In March 1992, fifteen months after Ms. Smith's death and nine months after her estate tax return had been filed, the estate settled with Exxon for $681,840, an amount equal to only 27.5% of the Section

---

[25]We conclude that a strict application of *Ithaca Trust,* limiting it only to Section 2055 charitable bequests, is incorrect. Its reach extends also to cases such as ours involving claims against the estate under Section 2053(a)(3). *See Estate of McMorris,* 243 F.3d at 1261; *Estate of Smith,* 198 F.3d at 524.

[26]The Supreme Court cited *Ithaca Trust* as support for its application of date of death present value principles in calculating marital and charitable deductions to income expected to be used to pay an estate's administrative expenses. *See Commissioner v. Estate of Hubert,* 520 U.S. 93, 117 S.Ct. 1124, 1129-30, 137 L.Ed.2d 235 (1997).

2053(a)(3) deduction claimed originally. *Id.*

The government assessed a deficiency against the estate, arguing that the Section 2053(a)(3) deduction should be limited to the amount actually paid. Relying on *Ithaca Trust,* the Fifth Circuit held that the post-death settlement event could not be considered in determining the amount of the deduction:

> [W]e hold that the claim generating the estate tax deduction under [Section] 2053(a)(3) ... must be valued as of the date of the death of the decedent and thus must appraised [sic] on information known or available up to (but not after) that date. We therefore vacate and remand with instructions to the Tax Court that it admit and consider evidence of pre-death facts and occurrences that are relevant to the date-of-death value of Exxon's claim, without admitting or considering post-death facts and occurrences such as the Estate's settlement with Exxon, which occurred some fifteen months after Decedent's death.

*Id.* at 517-18.

Similarly, in *Estate of McMorris,* Mr. McMorris died in 1990 owning 13.4 shares of stock in NW Transport Service, Inc. The stock was listed on Mr. McMorris' estate tax return at an appraised value of $1,726,562 per share at the date of his death. The shares passed to Mrs. McMorris, and this price per share value became her basis in the stock. Mrs. McMorris then entered into an agreement with NW Transport to redeem the stock for $2,200,000 per share, payable over 120 months at ten percent interest. *Estate of McMorris,* 243 F.3d at 1256.

Mrs. McMorris died in 1991. On her federal estate tax return, her estate claimed Section 2053(a)(3) deductions of $3,960,525 for her 1991 federal individual income taxes, and $641,222 for her 1991 state individual income taxes. Both tax liabilities resulted largely from the gain generated by the NW Transport stock redemption. *Id.* In 1994, the government issued a notice of deficiency to Mr. McMorris' estate, claiming that the value of the NW Transport stock was $3,618,040 per share, not the $1,726,562 per share claimed on his estate tax return. Mr. McMorris' estate contested the determination and, in 1996, after lengthy negotiations, the parties settled, meeting almost halfway at $2,500,00 per share. This value then became the new basis for the stock redeemed by Mrs. McMorris. Due to her increased basis, the taxable gain generated by the redemption was eliminated and she realized a loss. *Id.*

In January 1996, Mrs. McMorris' estate filed an amended 1991 individual federal income tax return seeking a refund of $3,332,443.[27] It did not, however, file an amended estate tax return decreasing the amount of the Section 2053(a)(3) deduction originally claimed for federal and state income taxes.

---

[27]The amount was subsequently approved and refunded in 1997. The record does not indicate that Mrs. McMorris' estate ever filed an amended 1991 individual state income tax return.

By this time, Mrs. McMorris' estate was already embroiled in tax court litigation with the government on unrelated issues. The estate's filing of an amended income tax return, but not an amended estate tax return, caused the government to react. It filed an amended answer in tax court, claiming that the estate was no longer entitled to such a large Section 2053(a)(3) deduction as the tax liabilities upon which it was based were now subject to a refund. The government argued that the deductions should reflect the per share stock value reached in the 1996 settlement between Mr. McMorris' estate and the government, not the 1991 per share appraised value at Mr. McMorris' date of date. The tax court agreed. *Id.* at 1257.

Relying upon *Ithaca Trust,* the Tenth Circuit reversed the tax court and held that the 1996 post-death settlement event could not be considered in determining the amount of the deduction. It remanded with directions to "*vacate* the determination of the estate tax deficiency at issue [based on the settlement value] and to recalculate any remaining *unrelated* deficiencies owing." *Id.* at 1263 (emphasis added). As the *Estate of McMorris* date of death value was already established, the Section 2053(a)(3) deduction stood as originally filed; it was unnecessary for the Tenth Circuit to request a recalculation upon remand. *Id.*

By contrast, in *Estate of Smith,* the date of death value was not established when the Fifth Circuit chose to follow *Ithaca Trust* and disregard post-death events. *Estate of Smith,* 198 F.3d at 526. The date of death value was unknown. The amount claimed by Ms. Smith's estate to be the date of death value was only the litigation demand amount being made by Exxon at her date of death. It was therefore necessary for the Fifth Circuit to request a recalculation upon remand. *Id.*

We face a similar situation here. We conclude that the Section 2053(a)(3) deduction should be the value at Mrs. O'Neal's date of death. We still, however, do not know what that value is. As in *Estate of Smith,* it is not necessarily the amount of the demand being made by the government at Mrs. O'Neal's death. Like the Fifth Circuit, we must remand this case to the district court for a recalculation of the deduction. *Id; see also Estate of Van Horne v. Commissioner,* 720 F.2d 1114 (9th Cir.1983)(date of death valuation for spousal support obligation); *Propstra v. United States,* 680 F.2d 1248 (9th Cir.1982)(date of death valuation for encumbered real estate where "as a matter of law, when claims are for sums certain and are legally enforceable as of the date of death, post-death events are not relevant in computing the permissible deduction").

4.      *The Proper Valuation in this Case*

Based upon the foregoing discussion, we find that the district court erred when it considered the

post-death tax court settlement amount of $563,314 determined some nine months after Mrs. O'Neal's death in calculating the value of the estate's Section 2053(a)(3) deduction. Yet, conversely, we find that no case holds that the value at the date of death is the demand amount, $9,407,226, being made here by the government at the date of death. *See, e.g., Estate of Smith,* 198 F.3d at 519. We therefore vacate the opinion of the district court on this issue and remand for evidentiary hearing on valuation.

On remand, the district court is instructed neither to admit nor consider evidence of post-death occurrences when determining the date of death value of the Section 2053(a)(3) deduction. *Id.* at 526. It will be incumbent on each party to supply the district court with relevant evidence of pre-death facts and occurrences supporting the date of death value of the deduction as advocated by that party. *Id.* The district court will then, by using informed judgment, reasonableness and common sense, weighing all relevant facts and evaluating their aggregate significance, determine a sound valuation.[28] *See* Revenue Ruling, 1959-1 C.B. 237, Rev. Rul. 59-60 (1959).

*B.     Attorneys' Fees Paid Before Death Pursuant to Durable Power of Attorney*

Alabama law construes powers of attorney strictly. *See Lamb v. Scott,* 643 So.2d 972, 973 (Ala.1994). It restricts powers of attorney to express grants of authority and those incidental grants of authority that are necessary to carry out the express grants. *Id.* at 974. Under this agency relationship, the holder of the power of attorney promises to use it for the sole benefit of the donor of the power. *Id.* The agent is not permitted to profit from this special agency relationship. *See Lisenby v. Simms,* 688 So.2d 864, 867 (Ala.Civ.App.1997).

Here when the estate declined to produce copies of legal fee invoices on the basis of attorney-client privilege, the district court found a proper accounting lacking. In its findings, it determined that the estate had failed to produce sufficient evidence proving that the $114,022 in attorneys' fees paid by Emmet pursuant to his mother's power of attorney before her death were for her benefit and not his.

After an extensive review of the record, we find that the estate may not assert entitlement to a monetary benefit on the one hand, and then hide behind a claim of privilege on the other. Indeed it is the law of this circuit that information involving receipt of attorneys' fees from a client is not generally privileged.

---

[28]Whether our holding benefits the government or the taxpayer will depend upon the facts of each particular case. *See, e.g., Estate of Lester v. Commissioner,* 57 T.C. 503 (1972) (where the *Ithaca Trust* date of death value approach benefitted the government and not the estate in calculating a claim against it for alimony payments).

*See In re Slaughter,* 694 F.2d 1258, 1260 (11th Cir.1982), *citing United States v. Jones (In re Grand Jury Proceedings),* 517 F.2d 666 (5th Cir.1975).[29] We doubt that a substantiation of legal fees by the estate will reveal confidential information. Without this information, the evidence was insufficient to support the claim. We find that the sum is therefore an asset of Mrs. O'Neal's gross estate under Section 2031(a).

C.       *Attorneys' Fees Paid After Death as Administrative Expenses of the Estate*

    Section 2053(a)(2) allows a deduction for administrative expenses such as attorneys' fees. The amount claimed must be actually and necessarily incurred in the administration of the estate and must be reasonable. *See* Treas. Reg. § 20.2053-3(a), 3(c). Further, deductions under the Internal Revenue Code are a matter of legislative grace and the taxpayer who claims the benefit must bear the burden of proof that he is entitled to the particular deduction. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992).

    Here the question is not whether the attorneys' fees paid by the estate after Mrs. O'Neal's death were deductible administrative expenses under Section 2053(a)(3), but whether they were substantiated by the estate. Again, the estate invoked privilege. Again, the district court found the evidence presented insufficient. Upon our review of the record, as discussed in Subpart B, we also find the evidence insufficient.

D.       *Interest Expense Deduction*

    This issue appears to have come full circle. Both parties now appear to be in agreement that the interest expense deduction amount fixed by the district court, based upon an arbitrary date, is premature. We agree. The proper amount must be calculated by the district court on remand when all litigation in this case is concluded.

## V. CONCLUSION

    As to the central issue on appeal, we conclude that the value of the deduction claimed by the estate for claims against the estate under Section 2053(a)(3) must be valued as of the date of the decedent's death. All events occurring after the decedent's death that alter the value must be disregarded. That part of the district court order considering post-death events in limiting the amount of the deduction is vacated. This issue is remanded to the district court for an evidentiary hearing with instructions to value the deduction at the date of death.

---

   [29]A "limited and rarely available" exception to this general rule involves situations where the disclosure of legal fee information would expose the identity of a previously undisclosed client or suspect. *Jones,* 517 F.2d at 669.

As to the issue of the increase in the decedent's gross estate under Section 2031 for pre-death attorneys' fees paid pursuant to a power of attorney by Mrs. O'Neal's son Emmet, we have conducted an extensive review of the record. Whether or not these payments were made for the sole benefit of the decedent, or were made for Emmet's benefit, was never substantiated. We affirm the order of the district court granting summary judgment on this issue.

As to the issue of the deductibility of post-death attorneys' fees as administrative expenses under Section 2053(a)(2), upon our review of the record, we conclude that the estate has also failed to substantiate whether these fees were reasonable and properly incurred in the administration of the estate under the terms of the statute. We also affirm the order of the district court granting summary judgment on this issue.

As to the issue of the amount of the estate's administrative expense deduction under Section 2053(a)(2), for interest accruing on unpaid estate tax liability, both parties now agree that the sum fixed by the district court is premature, and that a recomputation should be made at the conclusion of litigation. That part of the district court's amended order determining such amount to be $307,750, is vacated. This issue is remanded to the district court with instructions to recalculate the amount of the interest deduction at the conclusion of all litigation.

AFFIRMED in PART; VACATED in PART; and REMANDED with INSTRUCTIONS.