T.C. Memo. 2001-303

UNITED STATES TAX COURT

ESTATE OF ALGERINE ALLEN SMITH, DECEASED, JAMES ALLEN SMITH,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent*

Docket No. 19200-94.                    Filed November 21, 2001.

Harold A. Chamberlain and Michael C. Riddle, for petitioner.

R. Scott Shieldes, for respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  This case is before the Court on remand from

the Court of Appeals for the Fifth Circuit for further

consideration consistent with its opinion in Estate of Smith v.

*This Memorandum Opinion supplements our Opinion in Estate
of Smith v. Commissioner, 108 T.C. 412 (1997), supplemented by
110 T.C. 12 (1998), revd., vacated, and remanded 198 F.3d 515
(5th Cir. 1999).

<u>Commissioner</u>, 198 F.3d 515 (5th Cir. 1999), reversing our decision in 108 T.C. 412 (1997), regarding the deductible amount of a claim against the estate for purposes of section 2053(a)(3),[1] vacating our judgment, and remanding for a determination of the value of the claim against the estate as of decedent's date of death.

FINDINGS OF FACT

We stated the detailed and intricate facts of this case in our original opinion. <u>Estate of Smith v. Commissioner</u>, 108 T.C. 412 (1997). We summarize the relevant facts from that opinion and set forth additional findings of fact for purposes of deciding the issue on remand.

<u>General Facts</u>

On April 23, 1970, Algerine Allen Smith (decedent), as lessor, entered into an oil, gas and mineral lease with Humble Oil & Refining Co. (Humble). Pursuant to this lease agreement, decedent retained a royalty interest in oil and gas production obtained from an 80-acre tract of land in Wood County, Texas. On April 23, 1970, Jessamine and Frankie Allen, decedent's aunts, also entered into oil and gas leases with Humble, pursuant to which they retained royalty interests from the oil and gas

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

production obtained from certain tracts of land in Wood County. Humble was subsequently acquired by Exxon Corporation (Exxon).

Jessamine and Frankie Allen died in 1979 and 1989, respectively, and decedent served as the independent executrix of both estates. Upon Jessamine's death, decedent inherited a portion of Jessamine's interest in the leased property. Upon Frankie's death, decedent inherited all of Frankie's interest in the leased property, as well as the remaining portion of Jessamine's interest, which Frankie had previously inherited.

Decedent's, Frankie's, and Jessamine's interests in the Wood County property were part of a unit formation known as the Hawkins Field Unit (HFU). The Texas Railroad Commission, which regulates oil and gas operations in Texas, approved the HFU for unitization on November 26, 1974. In a unit agreement, effective January 2, 1975, interest owners in the area utilized oil and gas rights pertaining to the unitized formation. The unit agreement embraces interests of approximately 2,200 royalty interest owners[2] and 300 working interest owners. Exxon is the sole unit operator of the HFU and possesses the exclusive right to conduct HFU operations pursuant to a unit operating agreement between Exxon and the other working interest owners.[3]

---

[2]Decedent, Jessamine, and Frankie were royalty interest owners.

[3]Exxon was the HFU's largest working interest owner.

During the early operation of the HFU, the Federal Government, acting initially through the Federal Energy Administration and later through the Department of Energy (DOE), regulated the price of domestic crude oil through the application of two-tier price regulations under 10 C.F.R. secs. 212.73 and 212.74 (1975). Producers were required to sell "old" crude oil at the lower tier price and were allowed to sell "new" crude oil at a higher price.

In June 1978, the DOE filed suit against Exxon as operator of the HFU. The DOE contended that Exxon had misclassified crude oil produced from the HFU, which resulted in overcharges in violation of the DOE's petroleum price regulations. Exxon vigorously defended against the DOE's allegations. Nevertheless, on October 9, 1980, Exxon announced to the HFU interest owners that it would begin to withhold amounts owed to the interest owners under Exxon's posted prices for the oil produced. In justification for tendering less than the amount due under Exxon's classification of the oil, Exxon stated that it desired to create a fund for payment of any liability it might eventually have to the DOE. The amounts withheld represented the difference between the higher price charged by Exxon and the lower price the DOE contended was the maximum lawful selling price. Exxon withheld these amounts from October 1, 1980, to January 28, 1981,

the date on which oil prices in the United States were decontrolled.

In response, certain HFU royalty interest owners filed suit against Exxon in October 1980 in the U.S. District Court for the District of Texas (Tyler Division), arguing that Exxon was required to pay them the full amount of their royalty. Jarvis Christian College v. Exxon Corp., docket No. TY-80-432-CA (the Jarvis Christian litigation). On February 6, 1981, decedent, individually and as executrix for the estate of Jessamine Allen, along with Frankie and other members of the Allen family (the Allen parties), filed a motion to intervene as party plaintiffs in the Jarvis Christian litigation. On February 24, 1981, the District Court filed an order granting leave to intervene.

On March 25, 1983, the U.S. District Court for the District of Columbia ruled that Exxon had violated the two-tier pricing regulations. United States v. Exxon Corp., 561 F. Supp. 816 (D.D.C. 1983) (Exxon I). The District Court entered judgment in favor of the DOE and ordered Exxon to make restitution to the U.S. Treasury (Treasury) of the full amount of HFU overcharges plus interest arising from sales of HFU crude oil for the period January 1, 1975, through January 27, 1981. The total amount of the judgment exceeded $895 million. On July 1, 1985, the Temporary Emergency Court of Appeals affirmed the District Court.

United States v. Exxon Corp., 773 F.2d 1240 (Temp. Emer. Ct. App. 1985).

On February 27, 1986, Exxon paid the judgment, which amounted to just under $2.1 billion with interest. The amount paid consisted of $895,501,164 in overcharges, $771,997,881 in prejudgment interest, and $428,273,813 in postjudgment interest.

On January 26, 1988, Exxon filed suit in the U.S. District Court for the Eastern District of Texas (Tyler Division) against the owners of royalty and mineral interests in the HFU. Exxon v. Arnold, docket No. TY-88-110-CA (E.D. Tex., Jan. 26, 1988). Exxon's suit was consolidated with the Jarvis Christian litigation at docket No. TY-80-432-CA (Consolidated Action).[4] Exxon sought reimbursement from the interest owners of the amounts which it had paid to the Treasury as a result of the DOE litigation.

Decedent, individually and as the executrix of the estate of Jessamine Allen, and Frankie were parties to the suit. The HFU royalty interest owners vigorously contested Exxon's claims. On June 22, 1988, the District Court issued an order declaring the threshold issue in the Jarvis Christian litigation to be the existence of a Federal common law reimbursement claim and ordering the parties to file dispositive motions as to that

---

[4]Hereinafter, we shall refer to this consolidated action as the Jarvis Christian litigation.

issue. Pursuant to this order, on July 22, 1988, the HFU royalty interest owners filed a motion for judgment for lack of Federal statutory or common law claims, asserting that neither Federal statutory law nor common law authorized any of Exxon's claims against them. On July 5, 1989, James M. Knowles (Mr. Knowles) entered his appearance on behalf of the Allen parties in the Jarvis Christian litigation. In his notice of appearance, Mr. Knowles informed the District Court that negotiations between Exxon and the Allen parties were presently underway.

On August 25, 1989, the District Court issued an order directing Exxon to address certain of the royalty interest owners' arguments. In its order, the District Court found that Exxon had an implied cause of action under Federal common law for reimbursement; however, it noted that, "If called upon to rule today, the Court would be inclined to dismiss Exxon's claim against the royalty owners. However, the Court is also aware that Exxon has not fully addressed the above issues." On August 29, 1989, Mr. Knowles advised decedent that, in light of the order, settlement discussions should be discontinued until Exxon filed its reply to the order, except that any proposals by Exxon for a nominal or nuisance value should be considered. On August 30, 1989, a letter from R.H. Kuhlmann (Mr. Kuhlmann), on behalf of Exxon, was sent to Mr. Knowles. The letter stated that Exxon was rejecting a settlement offer by the Allen parties and

proposed a counteroffer of $944,280 for Exxon's claim against the Allen parties.  The counteroffer was not accepted.

On October 10, 1989, Exxon filed its brief addressing the royalty owners' arguments.  In its brief, Exxon noted that the majority of claims had settled and indicated Exxon's willingness to settle the remaining claims.

On November 7, 1989, the District Court issued an order finding that genuine issues of material fact existed as to whether Exxon breached any duties owed to the royalty interest owners.  The District Court was also persuaded that Exxon's entire cause of action for reimbursement against the royalty interest owners was not barred by the doctrine of collateral estoppel, although the factual findings regarding the reasonableness of Exxon's actions made in Exxon I would preclude relitigation of the reasonableness of the same actions in the Jarvis Christian litigation.

On November 7, 1989, the District Court also issued an order granting an oral motion for reverse bifurcation.  The District Court ordered that the trial on the damages issue in the case would precede trial on the liability issue.  By order dated December 5, 1989, the District Court directed the parties to file any motions for summary judgment with respect to the issue of whether Exxon had suffered any damages.  Pursuant to this order, on January 16, 1990, Exxon filed a motion for partial summary

judgment and a brief in support of its motion against the royalty interest owners. Exxon argued that it should recover the pro rata share of all amounts paid to the U.S. Treasury as a result of the DOE litigation, including prejudgment and postjudgment interest. Also on January 16, 1990, the royalty and working interest owners filed a joint motion for summary judgment and a memorandum in support of their motion against Exxon. In their accompanying memorandum, the interest owners denied that any amounts were owed to Exxon, regardless of whether any liability under law could attach to them, because Exxon had not, in fact, suffered any loss in paying the approximately $2.1 billion judgment.[5]

On March 14, 1990, the royalty interest owners filed a joint opposition to Exxon's motion for partial summary judgment. In the joint opposition, the interest owners alleged that Exxon had "profited handsomely from its overcharges" and that the elderly interest owners faced "a very real risk" that they would not be able to recoup in their lifetimes any payments made to Exxon through tax-loss carryforwards to offset prior overpayments of income taxes attributable to the overcharges. On April 19, 1990, Exxon filed a reply to the royalty interest owners' joint opposition to Exxon's motion for partial summary judgment. In

---

[5]The Allen parties expressly adopted the joint motion for summary judgment filed on Jan. 16, 1990.

its reply, Exxon denied the interest owners' allegations and characterized them as unsupported and incorrect as a matter of law.

On March 23, 1990, decedent, as executrix of Frankie's estate, filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.[6] The amount of $944,280 was deducted as a claim against Frankie's estate pursuant to section 2053(a)(3). The attached Schedule K, Debts of the Decedent, and Mortgages and Liens, listed a debt described as "EXXON CORPORATION SETTLEMENT ON OVERPAYMENT OF ROYALTIES". The "Amount in contest" was listed as $1,888,777, and the "Amount unpaid to date" and "Amount claimed as a deduction" were listed as $944,280. Attached to the Form 706 was a billing statement prepared by Exxon for the period January 1, 1975, through February 27, 1986, showing Frankie's total share of the royalty interest as $1,888,777. Also attached to the Form 706 was the letter dated August 30, 1989, from Mr. Kuhlmann to Mr. Knowles,

---

[6]Decedent's name is signed on the line for "Signature(s) of executor(s)". The following certification is contained above decedent's signature:

> Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer other than the executor is based on all information of which preparer has any knowledge.

rejecting a settlement offer and proposing a counteroffer of $944,280 for Exxon's claim against the Allen parties.

Decedent died testate on November 16, 1990, in Texas. James Allen Smith, decedent's son, is the executor of decedent's estate, and he filed a Form 706 on July 12, 1991. On the Form 706, the estate claimed a deduction of $2,482,719 for a claim against the estate pursuant to section 2053(a)(3). The estate derived this amount from Exxon's contention that, with interest, the amount due from decedent for Exxon's claim was $2,482,719.[7] Net of interest, Exxon contended the amount due was $1,032,315.

On July 21, 1994, respondent issued a notice of deficiency. In the notice of deficiency, respondent determined that the estate's deduction for Exxon's claim against the estate was allowable in the amount of $681,840, rather than $2,482,719, because "it has not been established that any greater amount is deductible under the provisions of the Internal Revenue Code."

Prior Court Proceedings

The main issue for decision in this case was the amount the estate was entitled to deduct pursuant to section 2053(a)(3) for Exxon's claim against the estate. In our original opinion, we held that the amount of the estate's section 2053(a)(3) deduction for Exxon's claim was limited to the amount ultimately paid in

[7]This amount included amounts sought from Jessamine's and Frankie's interests, which decedent had inherited.

settlement of the claim.  Estate of Smith v. Commissioner, 108 T.C. at 425.

Additionally, we had to decide the issue of whether the income tax benefit derived by the estate as a result of the application of section 1341(a) was an asset which increased the gross estate.  Id. at 414.  We decided that it was, holding that the taxable estate had to be increased by the amount of section 1341(a) relief that was attributable to the amount the estate paid to Exxon in settlement of its claim.  Id. at 430.[8]

The estate appealed our decision.  The Court of Appeals for the Fifth Circuit held that Exxon's claim must be valued as of the decedent's date of death and, thus, must be appraised on information known or available up to (but not after) that date.[9] Estate of Smith v. Commissioner, 198 F.3d at 517.  The Court of

---

[8]In a supplemental opinion, we addressed a dispute by the parties regarding the Rule 155 computation.  Estate of Smith v. Commissioner, 110 T.C. 12 (1998).

[9]The Court of Appeals for the Fifth Circuit noted:

   Although we are persuaded that, on these facts, the Commissioner is not permitted to consider--much less rely exclusively on--the amount of the post-death settlement of the Exxon claim when valuing Decedent's allowable estate tax deduction, we are also persuaded that the estate is not entitled to deduct the full amount that was being claimed by Exxon at Decedent's death.  Rather, for the reasons that follow, we conclude that the correct analysis requires appraising the value of Exxon's claim based on the facts as they existed as of death.  [Estate of Smith v. Commissioner, 198 F.3d 515, 521 (5th Cir. 1999).]

Appeals did not perceive a meaningful distinction between the valuation of claims that are enforceable but questionable as to amount and claims where the amount is known but enforceability is in doubt.  Id. at 525.[10]  The Court of Appeals stated:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim."  [Id. at 525 (quoting Gowetz v. Commissioner, 320 F.2d 874, 876 (1st Cir. 1963)).]

On remand, we were instructed to admit and consider evidence of predeath facts and occurrences that are relevant to the date-of-death value of Exxon's claim, without admitting or considering postdeath facts and occurrences such as the estate's settlement with Exxon.  Id. at 517-518.  The Court of Appeals, quoting Rev. Rul. 59-60, 1959-1 C.B. 237, found the following words instructive to this case:

> A determination of fair market value, being a question of fact, will depend upon the circumstances in each case.  No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases....  A

---

[10]The Court of Appeals provided the following example:

> For example, if given the choice between being the obligor of (1) a claim known to be worth $1 million with a 50 percent chance of being adjudged unenforceable, or (2) a claim known to be enforceable with a value equally likely to be $1 million or zero, a rational person would discern no difference in choosing between the claims, as both have an expected value $500,000. * * *  [Id. at 525.]

sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. [Id. at 526.]

The Court of Appeals then emphasized that "every lawsuit is unique; thus it is incumbent on each party to supply the Tax Court with relevant evidence of predeath facts and occurrences supporting the value of the Exxon claim advocated by that party." Id. at 526.

The Court of Appeals also disagreed with our holding that the section 1341(a) income tax benefit that would arise from any payment of Exxon's claim was an asset includable in the gross estate. The Court of Appeals concluded that the value, for estate tax purposes, of the contingent section 1341 deduction was not a free-standing asset of the estate but was one of the factors to be considered in appraising the date-of-death value eventually assigned to Exxon's claim for purposes of the section 2053(a)(3) deduction. Id. at 528. The Court of Appeals noted:

Of course, once the Tax Court determines, on remand, the gross value of the Exxon claim for purposes of section 2053(a)(3), calculation of the section 1341 income tax benefit becomes a simple mathematical calculation, the result of which will diminish the gross value of the Exxon claim, dollar for dollar, to produce a net deduction from the Estate. * * * [Id.]

The Court of Appeals ultimately remanded the case for further proceedings consistent with the instructions provided in its opinion. Id. at 532.

## OPINION

The Internal Revenue Code imposes a Federal estate tax on the transfer of the taxable estate of a decedent who is a citizen or resident of the United States. Secs. 2001 and 2002. Section 2053(a)(3) allows a deduction from the gross estate for claims against the estate that are allowable by the laws of the jurisdiction under which the estate is administered. The issue for decision in the instant case is the value of Exxon's claim against the estate as of decedent's date of death for purposes of determining the amount of the estate's section 2053(a)(3) deduction.

## Burden of Proof

Before the trial on remand, the estate filed a Motion to Place Burden of Proof on Respondent. The estate argued that the Court of Appeals for the Fifth Circuit rejected respondent's presumption of correctness and that the burden had shifted to respondent to prove the existence and amount of the deficiency. We denied the estate's motion prior to the trial on remand.

The Court of Appeals said nothing about rejecting respondent's presumption of correctness. Rather, the Court of Appeals said: "it is incumbent on each party to supply the Tax Court with relevant evidence of predeath facts and occurrences supporting the value of the Exxon claim advocated by that party." Estate of Smith v. Commissioner, supra at 526. As explained

later, respondent presented such evidence at the trial on remand, but the estate declined to do so.

As a general rule, the Commissioner's determination bears a presumption of correctness, and the burden of proof rests with the taxpayer. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Time Ins. Co. v. Commissioner</u>, 86 T.C. 298, 313-314 (1986); cf. sec. 7491 (generally effective with respect to examinations commencing after July 22, 1998). In the notice of deficiency, respondent determined that the estate's deduction for Exxon's claim against the estate was allowable in the amount of $681,840, rather than $2,482,719, because "it has not been established that any greater amount is deductible under the provisions of the Internal Revenue Code."

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving the entitlement to any deduction claimed. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934). This burden includes establishing the amount of the deduction claimed. <u>Time Ins. Co. v. Commissioner</u>, <u>supra</u> at 314; <u>Nichols v. Commissioner</u>, 43 T.C. 135, 143 (1964) (citing <u>Burnet v. Houston</u>, 283 U.S. 223 (1931)). In <u>Sealy Power, Ltd. v. Commissioner</u>, 46 F.3d 382, 387 (5th Cir. 1995), affg. in part, revg. in part, and remanding in part T.C. Memo. 1992-168, the Court of Appeals for the Fifth Circuit held:

> The burden of overcoming the presumption of correctness
> in a deduction case properly rests with the taxpayer,
> who is the best source of information for determining
> entitlement to the claimed deductions.  In a deduction
> case, therefore, we apply the general rule of not
> looking behind the notice of deficiency to determine
> whether it is arbitrary. * * *

Consequently, the estate bears the burden of proving the amount
of its section 2053(a)(3) deduction.

## The Law of the Case Doctrine

The estate argues that it has met its burden of establishing
the amount of its section 2053(a)(3) deduction because the
parties stipulated to the fact, "With interest, Exxon in the
Jarvis Christian litigation claimed $2,482,719.00 from decedent."
The estate argues that this requires that the estate be allowed
to deduct the entire $2,482,719.  The estate contends that
section 2053(a) and section 20.2053-4, Estate Tax Regs., provide
for a deduction for the amount of an enforceable claim against
the estate and not for the value of the claim.

We note that the estate, in relying on its interpretation of
the opinion of the Court of Appeals, has decided not to follow
the Court of Appeals's guidance that "it is incumbent on each
party to supply the Tax Court with relevant evidence of predeath
facts and occurrences supporting the value of the Exxon claim
advocated by that party."  Estate of Smith v. Commissioner, 198
F.3d at 526.  Nor does the estate give any deference to the Court
of Appeals's statement that "we are also persuaded that the

estate is not entitled to deduct the full amount that was being claimed by Exxon at Decedent's death."  Id. at 521.  Rather, the estate argues that this language was not necessary to the Court of Appeals's decision, and, therefore, the court's instructions on valuing the claim constitute dicta.

Under the law of the case doctrine, the decision of a legal issue by an appellate court establishes the law of the case and must be followed in all subsequent proceedings in the same case at both the trial and appellate levels. Christianson v. Colt Indus. Op. Corp., 486 U.S. 800, 816 (1988); Reid v. Rolling Fork Pub. Util. Dist., 979 F.2d 1084, 1086 (5th Cir. 1992); Pollei v. Commissioner, 94 T.C. 595, 601 (1990).  The issues the lower court is precluded from considering include those that were decided by the appellate court expressly or by necessary implication.  Browning v. Navarro, 887 F.2d 553, 556 (5th Cir. 1989); Pollei v. Commissioner, supra.  The trial court on remand must follow the appellate court's mandate, and it is guided and confined by that court's decree and direction.  Pollei v. Commissioner, supra at 602.

The parties agree that Exxon was seeking $2,482,719 from decedent at the time of her death.  However, contrary to the estate's argument, the Court of Appeals did not find that Exxon's claim was enforceable to the extent of this amount.  Rather, the Court of Appeals found that the amount of the estate's section

2053(a)(3) deduction depended on the fair market value of Exxon's claim as of decedent's date of death. Estate of Smith v. Commissioner, 198 F.3d at 525-526. The Court of Appeals provided the following explanation concerning the amount of the estate's section 2053(a)(3) deduction:

> Although we are persuaded that, on these facts, the Commissioner is not permitted to consider--much less rely exclusively on--the amount of the post-death settlement of the Exxon claim when valuing Decedent's allowable estate tax deduction, we are also persuaded that the estate is not entitled to deduct the full amount that was being claimed by Exxon at Decedent's death. Rather, for the reasons that follow, we conclude that the correct analysis requires appraising the value of Exxon's claim based on the facts as they existed as of death. [Id. at 521.]

The Court of Appeals further stated:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim." [Id. at 525 (quoting Gowetz v. Commissioner, 320 F.2d 874, 876 (1st Cir. 1963)).]

Thus, although Exxon had a claim against decedent at the time of her death, the amount Exxon was seeking was not the amount the estate was entitled to deduct under section 2053(a)(3).

In Estate of O'Neal v. United States, 258 F.3d 1265 (11th Cir. 2001), the Court of Appeals for the Eleventh Circuit interpreted Estate of Smith v. Commissioner, supra, in a manner consistent with our view. Faced with a similar situation

involving a claim against an estate, that court followed the
reasoning and holding of the Court of Appeals for the Fifth
Circuit and provided the following explanation:

> in Estate of Smith, the date of death value was not
> established when the Fifth Circuit chose to follow
> Ithaca Trust and disregard post-death events.  The date
> of death value was unknown.  The amount claimed by Ms.
> Smith's estate to be the date of death value was only
> the litigation demand amount being made by Exxon at her
> date of death.  It was therefore necessary for the
> Fifth Circuit to request a recalculation upon remand.
>
>       We face a similar situation here.  We conclude
> that the Section 2053(a)(3) deduction should be the
> value at Mrs. O'Neal's date of death.  We still,
> however, do not know what that value is.  As in Estate
> of Smith, it is not necessarily the amount of the
> demand being made by the government at Mrs. O'Neal's
> death.  Like the Fifth Circuit, we must remand this
> case to the district court for a recalculation of the
> deduction.
> * * *
>
> * * * we find that no case holds that the value at the
> date of death is the demand amount, $9,407,226, being
> made here by the government at the date of death.  We
> therefore vacate the opinion of the district court on
> this issue and remand for evidentiary hearing on
> valuation.  [Id. at 1275; citations omitted.]

The Court of Appeals for the Eleventh Circuit concluded by
providing valuation instructions on remand nearly identical to
those provided by the Court of Appeals for the Fifth Circuit.
Id.

In the instant case, the estate's argument that it is
entitled to deduct the full amount of Exxon's claim was rejected
by the Court of Appeals when it remanded the case for a
determination of the fair market value of Exxon's claim as of

decedent's date of death.[11]  Accordingly, we follow the valuation
instructions enunciated by the Court of Appeals in order to
determine the proper amount of the estate's section 2053(a)(3)
deduction.

Valuation of Exxon's Claim as of Decedent's Date of Death

As mentioned earlier, the estate's only argument is that the
law of the case doctrine entitles it to deduct the entire amount
that Exxon was seeking from decedent.  The estate failed to
present other evidence supporting the value it advocates.[12]

Respondent did supply this Court with relevant evidence of
predeath facts and occurrences supporting the value of the Exxon
claim he advocates.  Respondent relied on the report and
testimony of his expert witness, Mark K. Glasser (Mr. Glasser),
to support his determination that the value of Exxon's claim as

---

[11]Indeed, we presume that if the Court of Appeals for the
Fifth Circuit believed that the amount Exxon was seeking from
decedent at the date of death was the measure of the value of the
claim for purposes of the estate's sec. 2053(a)(3) deduction,
then the Court of Appeals would have decided the case in the
estate's favor instead of remanding it to us with specific
instructions for valuing the claim.

[12]After remand by the Court of Appeals, the only document
submitted into evidence by the estate was a copy of the
transcript of a Rule 155 hearing conducted after our original
opinion.  At trial on remand, the estate did not present any
witnesses or submit any expert reports.  The only evidence
submitted by the estate at trial was in the form of an oral
stipulation between the parties that David J. Beck was the
attorney who had been retained to represent Exxon to file the
complaint that was filed in the Jarvis Christian litigation, and
Mr. Beck was retained to pursue Exxon's claim against the royalty
owners, which he in fact did.

of decedent's date of death was not more than $681,840.  Mr. Glasser has practiced law for 23 years, focusing principally upon oil and gas, securities, and general corporate litigation.  He has served as counsel to a number of oil companies and has handled numerous oil and gas litigation disputes, including disputes over royalty claims.  In 1993, Mr. Glasser began training to become a mediator.  Since that time, he has mediated approximately 450 cases, including oil and gas disputes involving claims by and against major oil companies.  He has authored publications on mediation and arbitration of disputes and also trained other mediators and arbitrators.  We find that Mr. Glasser, a lawyer who has settled and mediated numerous cases involving disputes similar to the one between Exxon and decedent, is qualified to render his opinion as an expert for purposes of this case.  See, e.g., Askanase v. Fatjo, 130 F.3d 657, 672 (5th Cir. 1997) (discussing when a lawyer may testify as an expert witness); Estate of Davis v. Commissioner, T.C. Memo. 1993-155; Estate of Lennon v. Commissioner, T.C. Memo. 1991-360; Smith, Inc. v. Commissioner, T.C. Memo. 1977-23.

Mr. Glasser identified his assigned task as ascertaining the value of Exxon's claim as of decedent's date of death and offering an expert opinion on the value of the claim as of that time.  Mr. Glasser relied primarily on documentary evidence relating to the Jarvis Christian litigation.  Mr. Glasser's

opinion was based principally upon the District Court's orders issued before decedent's death regarding the liability issue in that case.

In Mr. Glasser's opinion, the documents relating to the Jarvis Christian litigation indicated that there was a great deal of uncertainty surrounding Exxon's claim against the royalty owners. On one hand, the District Court found that Exxon had the right to seek recovery from the royalty owners under a theory of equitable recoupment. On the other hand, Mr. Glasser believed that the District Court's orders were discouraging to Exxon concerning the probability that Exxon would prevail on its claim. Mr. Glasser believed that Exxon and the royalty owners, at the time of decedent's death, could have anticipated that there was a "greater likelihood" that Exxon would be awarded substantially less than all of the damages that it claimed.

As part of his valuation determination, Mr. Glasser relied on the District Court's orders entered on August 25 and November 7, 1989. In the August 25, 1989, order, the District Court declared that Exxon had a viable cause of action for equitable recoupment against the royalty owners, but it also noted that the court was inclined to dismiss Exxon's claim against the royalty owners. In the November 7, 1989, order, the District Court stated that it "remains persuaded that Exxon at least owed the royalty interest owners the duty to act as a reasonably prudent

operator and perhaps owed an even higher fiduciary or 'quasi-fiduciary duty'."  Mr. Glasser concluded that the net effect of the two orders could only have greatly encouraged the royalty owners and correspondingly discouraged Exxon about the probability that Exxon would prevail on its claim against the royalty owners.  Additionally, Mr. Glasser believed that the District Court would have found it inequitable for the royalty owners to be accountable for any interest that accrued as a result of Exxon's perceived intractability before the DOE.  Thus, Mr. Glasser felt that the orders would have motivated Exxon to settle the royalty owners' cases on a highly discounted basis.  On the basis of Mr. Glasser's personal experience representing companies of Exxon's stature in controversial matters such as DOE litigation, he believed Exxon would be eager to end the matter quickly and discreetly.  Mr. Glasser also considered the fact that Mr. Knowles, the attorney for the Allen parties, whom Mr. Glasser described as a most able practitioner of oil and gas litigation, had recommended rejection of Exxon's offer to settle the claims against the Allen parties.

In order to make a valuation determination, Mr. Glasser took into consideration evidence of predeath events, and he assigned mathematical probabilities to:  (1) Whether the royalty owners would be held liable to Exxon; (2) Exxon's claim for recoupment of the base amount paid to the DOE; and (3) Exxon's claim for

recoupment of prejudgment and postjudgment interest.  Mr. Glasser felt that there was not more than a 50-percent probability that a jury would find in favor of Exxon on the liability issue.  Assuming Exxon did obtain a favorable ruling on the liability issue, Mr. Glasser felt that there was not more than a 50-percent probability that Exxon would be awarded decedent's pro rata portion, $1,032,315, of the base amount paid by Exxon to the DOE judgment.  Finally, Mr. Glasser felt that there was not more than a 30-percent probability that Exxon would recover the $1,450,404 of prejudgment and postjudgment interest that it paid to the DOE attributable to decedent's pro rata share.  Applying all these probabilities, Mr. Glasser ultimately determined that the value of the Exxon claim as of decedent's date of death was $475,639.35.  Mr. Glasser provided the following chart summarizing his calculations:

| | | |
|---|---|---|
| Probability of affirmative findings on liability: | 50% | |
| Probability of assessment of damages on $1,032,315 base paid by Exxon: | 50%, or | $516,157.50 |
| | Less 50% liability discount = | $258,078.75 |
| Probability of assessment of pre- and post-judgment interest of $1,450,404: | 30%, or | $435,121.20 |
| | Less 50% liability discount = | $217,560.60 |
| | Total | $475,639.35 |

In addition to the report and testimony of Mr. Glasser, other evidence indicates that the value of Exxon's claim as of decedent's date of death was significantly less than the amount Exxon was seeking from decedent. We note the contents of the Form 706, signed by decedent on March 21, 1990, under penalties of perjury, and filed by decedent in her capacity as executrix of Frankie's estate. The Form 706 with its accompanying schedules and statements, including Mr. Kuhlmann's letter that was attached to the Form 706, indicates that Exxon was willing to settle its claim against all the Allen parties for $944,280. Despite the fact that the Allen parties rejected this offer, presumably because they thought Exxon's proposal was too high, decedent, as executrix for Frankie's estate, deducted the amount of Exxon's offer of $944,280 to settle claims against all of the Allen parties. The full amount of Exxon's claim against Frankie was $1,888,777.

The parties agree that Exxon was seeking $2,482,719 from decedent at the time of her death. This amount included amounts sought from Jessamine's and Frankie's interests, which decedent had inherited. Thus, Exxon's counteroffer was approximately 38 percent of the total amount it was seeking from the Allen parties.[13] This counteroffer by Exxon to the Allen parties was

---

[13]944,280 ÷ 2,482,719 = .3803.

not accepted.[14]  Additionally, the evidence in the record
indicates that the Jarvis Christian defendants vigorously
contested Exxon's claims.  These facts, including Mr. Glasser's
testimony, support a finding that the fair market value of
Exxon's claim as of decedent's date of death was significantly
less than the amount Exxon was seeking, and not more than the
$681,840 allowed in the notice of deficiency.

_____

[14]At trial on remand, the estate objected, under Fed. R.
Evid. 408, to the introduction of Exhibit 60, which was the
letter containing the settlement offer from Exxon to the Allen
parties.  Exhibit 60 was included in the second supplemental
stipulation of facts that was filed prior to the trial on remand.
The second supplemental stipulation of facts states that "Any
relevance objection may be made with respect to all or any part
of this stipulation at or before the time of trial, but all other
evidentiary objections are waived unless specifically expressed
in this stipulation."  In the second supplemental stipulation of
facts, the estate objected to Exhibit 60 only on the grounds of
relevance and hearsay.  A fundamental rule of evidence is that an
objection not timely made is waived.  United States v. Jamerson,
549 F.2d 1263, 1266-1267 (9th Cir. 1977); Fed. R. Evid.
103(a)(1).  In the instant case, the estate waived all
evidentiary objections to Exhibit 60 except for relevance and
hearsay, and failed to make a timely objection.  See, e.g.,
Calcasieu Marine Nat. Bank v. Grant, 943 F.2d 1453, 1458 (5th
Cir. 1991); Fed. R. Evid. 103(a)(1).  In any event, the estate
did not raise an objection based on Fed. R. Evid. 408 to the
admission of Exhibit 82, which was the estate tax return for
Frankie Allen which decedent signed and filed in her capacity as
executrix of Frankie's estate.  The same settlement offer from
Exxon to the Allen parties was included in the estate tax return.
See supra pp. 10-11, 26.  Additionally, we note that settlement
evidence may be admissible where it relates to a claim other than
the one being litigated, Towerridge, Inc. v. T.A.O., Inc., 111
F.3d 758, 770 (10th Cir. 1997), or where it is for a purpose
other than to prove liability for or invalidity of the claim or
its amount.  Reichenbach v. Smith, 528 F.2d 1072, 1074 (5th Cir.
1976); Fed. R. Evid. 408.

Section 1341 Income Tax Benefit and Its Effect on the Value of Exxon's Claim

Section 1341 allows an income tax deduction to a taxpayer who previously received taxable income under a claim of right, but who must later repay some or all of that income.  For cash method taxpayers, the deduction is taken when computing income tax liability for the year of the repayment.  Sec. 1341(a).  In its opinion, the Court of Appeals for the Fifth Circuit stated that the deduction under section 1341 was a factor to consider in determining the date-of-death value of Exxon's claim because the deduction results in an income tax benefit to the estate.  Estate of Smith v. Commissioner, 198 F.3d at 528-529.

The estate argues that the section 1341 income tax benefit relates to the right to an income tax refund which did not exist on decedent's date of death.  The estate contends that the Court of Appeals's instructions not to consider evidence of postdeath occurrences when determining the date-of-death value of Exxon's claim precludes this Court from considering this issue.

The estate's argument is contrary to the express language contained in the Court of Appeals's opinion.  On the issue of the section 1341 income tax benefit, the Court of Appeals provided:

> Of course, once the Tax Court determines, on remand, the gross value of the Exxon claim for purposes of section 2053(a)(3), calculation of the section 1341 income tax benefit becomes a simple mathematical calculation, the result of which will diminish the gross value of the Exxon claim, dollar for dollar, to

produce a net deduction from the Estate. * * *  [Id. at 528.]

The Court of Appeals also provided the following instructions:

Thus, on remand, when appraising the net value of the deduction allowed the estate under section 2053(a)(3), account must be taken of the section 1341 income tax benefit that would have inured to the benefit of the Estate if it had ultimately been held liable (or settled) for a sum equal to the appraised date-of-death gross value of Exxon's claim. [Id. at 529; fn. reference omitted.]

On the basis of the Court of Appeals's instructions, we reject the estate's contention that we are precluded from considering the section 1341 income tax benefit in valuing Exxon's claim.

Respondent calculated the amount of the section 1341 income tax benefit using Mr. Glasser's determination that Exxon's claim was worth $475,639.35.  Respondent relied on the findings in our prior opinion in Estate of Smith v. Commissioner, 110 T.C. 12 (1998), addressing the proper method for computing an income tax credit and resulting overpayment under section 1341(a)(5) and (b), and determined that the amount of the inchoate section 1341 income tax benefit affecting the value of the section 2053(a)(3) deduction was $24,691.32.  Respondent subtracted this amount from Mr. Glasser's valuation of Exxon's claim, resulting in a net value of $450,948.03.  Although this amount is less than the amount previously allowed in the notice of deficiency, respondent does not seek to reduce the estate's section 2053(a)(3) deduction below the $681,840 amount allowed in the notice of deficiency.

We find that the net fair market value of Exxon's claim at the time of decedent's death was not more than $681,840.

Conclusion

Valuing a lawsuit can be a difficult task. As the Court of Appeals noted:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim." [Estate of Smith v. Commissioner, 198 F.3d at 525 (quoting Gowetz v. Commissioner, 320 F.2d 874, 876 (1st Cir. 1963)).]

See also Estate of Davis v. Commissioner, T.C. Memo. 1993-155 (a lawsuit is not the type of asset, either tangible or intangible, which readily fits within the categories of things regularly traded in commerce). The Court of Appeals also noted:

> Obviously, the position of a defendant in a pending lawsuit is not a thing commonly bought or sold. There is certainly no ready market in which the Estate could pay another to assume its place as the subject of Exxon's claim. * * * [Estate of Smith v. Commissioner, supra at 529 n.61.]

The evidence indicates that respondent and Mr. Glasser studied the instructions set forth by the Court of Appeals and attempted to adhere to those instructions in reaching their valuation determinations. In reaching our decision, we have evaluated the evidence presented in a manner we believe is consistent with the instructions provided by the Court of Appeals for the Fifth Circuit. Respondent presented credible evidence

supporting a valuation of Exxon's claim that is below the amount previously allowed as a deduction in the notice of deficiency. Nevertheless, respondent does not seek to reduce the amount of the estate's section 2053(a)(3) deduction for Exxon's claim below the $681,840 allowed in the notice of deficiency.  On the other hand, the estate failed to produce evidence of the value of Exxon's claim in accordance with the instructions provided by the Court of Appeals for the Fifth Circuit, instead arguing that it is not required to follow those instructions.  Consequently, the estate has failed to establish that it is entitled to a deduction in excess of the amount allowed in the notice of deficiency.[15] Accordingly, we hold that the estate's section 2053(a)(3) deduction is limited to $681,840.

> Decision will be entered under Rule 155.

---

[15]This Court has previously noted that, where the burden of proof rests with the taxpayer, the failure to present sufficient evidence establishing fair market value generally results in the taxpayer's failure to carry his burden of proof and allows holding for the Commissioner even if the valuation of the Commissioner's expert is ultimately rejected.  See Anselmo v. Commissioner, 80 T.C. 872, 884-886 (1983), affd. 757 F.2d 1208 (11th Cir. 1985); Leibowitz v. Commissioner, T.C. Memo. 1997-243.